**Wayne Carl COLEMAN,**
**Petitioner-Appellant,**

v.

**Ralph KEMP, Warden, Georgia**
**Diagnostic and Classification**
**Center, Respondent-Appellee.**

No. 82–8310.

United States Court of Appeals,
Eleventh Circuit.

Dec. 9, 1985.

Rehearing and Rehearing En Banc
Denied Jan. 31, 1986.

Joseph M. Nursey, Millard C. Farmer, Atlanta, Ga., for petitioner-appellant.

Arthur K. Bolton, Atty. Gen., Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before JOHNSON, ANDERSON and CLARK, Circuit Judges.

ANDERSON, Circuit Judge:

In this capital case, petitioner Wayne Coleman appeals from the federal district court's order denying his petition for habeas corpus relief. At trial, the state's evidence revealed the following tragic facts. On May 14, 1973, Coleman and Carl Isaacs entered Jerry Alday's mobile home in Donalsonville, in Seminole County, Georgia, while their two companions, George Dungee and Billy Isaacs, remained outside initially. Several members of the Alday family began to arrive shortly thereafter. When Ned and Jerry Alday drove up in a jeep, Coleman, Carl Isaacs and Billy Isaacs forced the two to enter the home. Coleman then forced Ned Alday into the home's north bedroom and shot him in the head several times. Carl Isaacs forced Jerry Alday into the south bedroom and shot him in the head several times. Jimmy Alday then drove up on a tractor, knocked on the door, and entered. Carl Isaacs forced him into the living room and shot him to death. Mary Alday, Jerry's wife, then drove up and Carl Isaacs forced her inside. Immediately thereafter, Aubrey and Chester Alday arrived in a pickup truck. While Mary Alday was forced into the bathroom, Carl Isaacs took Aubrey to the south bedroom and killed him. Coleman took Chester Alday to the other bedroom and killed him there. Mary Alday was then raped on the kitchen floor, taken from the mobile home, raped again in a wooded area, and then shot to death by Dungee.[1]

On September 4, 1973, a Seminole County grand jury indicted Coleman, Carl Isaacs, Dungee, and Billy Isaacs on six counts of murder. Some three months later, Billy Isaacs pleaded guilty to armed robbery and burglary. He was sentenced to a forty-year prison term. In January, 1974, the three remaining defendants were tried separately, convicted, and sentenced to death by electrocution. Carl Isaacs' trial began on Monday, December 31, 1973; Dungee's trial began the following Monday, January 7, 1974, and Coleman's on the next succeeding Monday, January 14.

The Supreme Court of Georgia affirmed Coleman's convictions and sentences. The United States Supreme Court subsequently denied his petition for writ of certiorari. *Coleman v. State,* 237 Ga. 84, 226 S.E.2d 911 (1976) (Justice Hill dissenting on the basis of the pretrial publicity), *cert. denied,* 431 U.S. 909, 97 S.Ct. 1707, 52 L.Ed.2d 394 (1977). Coleman filed a state habeas corpus petition in the Superior Court of Tattnall County. On June 13, 1980, the superior court denied Coleman's habeas corpus petition. On October 31, 1980, the Supreme Court of Georgia denied Coleman's application for a certificate of probable cause to appeal. The United States Supreme Court denied Coleman's second petition for writ of certiorari. *Coleman v. Balkcom,* 451 U.S. 949, 101 S.Ct. 2994, 68 L.Ed.2d 334 (1981).

---

1. Additional facts are noted in *Coleman v. State,* 237 Ga. 84, 226 S.E.2d 911, 913–14 (1976), *cert.* *denied,* 431 U.S. 909, 97 S.Ct. 1707, 52 L.Ed.2d 394 (1977).

On July 8, 1981, Coleman filed for habeas corpus relief in the United States District Court for the Middle District of Georgia. In answer to Coleman's habeas corpus petition, respondent conceded that Coleman had exhausted available state remedies for the issues raised in his petition. The district court denied Coleman's petition. *Coleman v. Zant*, No. 81–42–THOM (M.D.Ga. Mar. 11, 1982). Coleman appealed to this court. Among other issues, Coleman argued that the federal district court erred in denying his request for discovery and an evidentiary hearing. After reviewing the record, we remanded to the district court for an evidentiary hearing. *Coleman v. Zant*, 708 F.2d 541 (11th Cir.1983). After further evidentiary development, the district court on March 18, 1985, again denied Coleman's petition for habeas corpus relief.

Petitioner raises six issues: (1) whether pretrial publicity and the community's atmosphere were so prejudicial and inflammatory that the trial court's refusal to grant petitioner's motion for a change of venue deprived him of rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments; (2) whether the special prosecutor's participation in the trial deprived him of rights guaranteed by the Sixth, Eighth and Fourteenth Amendments; (3) whether the Constitution required the state trial judge's disqualification because he was the special prosecutor's uncle; (4) whether the trial court's jury instructions impermissibly shifted the burden of proof of intent and malice from the state to the defendant in violation of the Fourteenth Amendment's due process clause; (5) whether petitioner was denied effective assistance of counsel; and (6) whether the trial court's sentencing instructions adequately informed the jury as to its duty to consider mitigating circumstances. Since we conclude that this case is of that rare breed which does exceed the extremely high threshold test of presumed prejudice requiring a change of venue, we decline to rule on the other issues raised by Coleman.

In Part I we discuss briefly the relevant legal standard. In Part II, we describe the publicity surrounding the petitioner's trial. To convey an accurate picture of the sentiment in this small rural community, we have found it necessary to provide a comprehensive description of the publicity, beginning with the printed media, then the broadcast media, and finally, word-of-mouth communication in Seminole County. In Part III, we apply the legal standard to the totality of the circumstances generated by the publicity surrounding the petitioner's trial, as evidenced by the record in the case.

## I. PRESUMED PREJUDICE AND A CHANGE OF VENUE

The standards governing the change of venue issue were explained briefly in *Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir.1983), but those standards bear repeating. Ultimately, those standards derive from the Fourteenth Amendment's due process clause, which safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere. In such a case, due process requires the trial court to grant defendant's motion for a change of venue, *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or a continuance, *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). At issue is the fundamental fairness of the defendant's trial, *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). There are two standards which guide analysis of this question, the "actual prejudice" standard and the "presumed prejudice" standard. Because we grant relief on the presumed prejudice claim, we do not address the actual prejudice argument raised by Coleman.

Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. *Rideau v. Louisiana,* 373 U.S. at 726–27, 83 S.Ct. at 1644–45; *Murphy v. Florida,* 421 U.S. at 798–99, 95 S.Ct. at 2035; *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980),[2] *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981); *see also Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). The presumed prejudice principle is "rare[ly]" applicable, *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976), and is reserved for an "extreme situation." *Mayola, supra,* at 997. In fact, our research has uncovered only a very few additional cases in which relief was granted on the basis of presumed prejudice. *See United States ex rel. Bloeth v. Denno,* 313 F.2d 364 (2d Cir.), *cert. denied,* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963); *Pamplin v. Mason,* 364 F.2d 1 (5th Cir.1966). The particular standard was clearly stated in *Mayola v. Alabama:* "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '[jury] prejudice is presumed and there is no further duty to establish bias.'" 623 F.2d at 997 (quoting in part from *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980)).

Because the question whether prejudice should be presumed is by its very nature shaped by the facts, we begin by reviewing the two key Supreme Court cases on that issue. *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), is the only Supreme Court decision in which prejudice was presumed from pretrial publicity and no other outside influences. In *Rideau,* the defendant confessed to robbing a bank in Calcasieu Parish, kidnapping three of the bank's employees, and killing one of them. This confession was videotaped and subsequently broadcast three times by a local television station. The three broadcasts were seen respectively by 24,000, 53,-000, and 29,000 people in the community. *Id.* at 724, 83 S.Ct. at 1418. At that time, Calcasieu Parish had a population of 150,-000. At trial, the defendant's motion for a change of venue was denied by the trial court. The Supreme Court held that this denial violated the due process clause. Although the court noted that three jurors who decided the case (the defendant was convicted and sentenced to death) had seen the televised confession, *id.* at 725, 83 S.Ct. at 1418, the Court was willing to presume prejudice "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury." *Id.* at 727, 83 S.Ct. at 1419. In the Court's view, the televised confession *"was* Rideau's trial," and "[a]ny subsequent proceedings in the community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726, 83 S.Ct. at 1419.

The other important case where a defendant called for the Supreme Court to presume prejudice based on prejudicial publicity was *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). There the Supreme Court held that the defendant was not denied due process when the trial court denied his motion for a change of venue. The defendant had been convicted in 1970 of offenses related to a robbery that took place in January 1968. In 1968 and 1969, the defendant was indicted for murder in another county, declared mentally incompetent, indicted on a federal conspiracy charge, and later declared competent. All of these events were extensively

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

publicized since the defendant himself was newsworthy by virtue of his earlier participation in the 1964 theft of the Star of India sapphire. The Court rejected defendant's presumed prejudice claim, however, finding that there was no inflamed community atmosphere, and noting that the news articles complained of appeared seven to twenty months before the jury was selected and that the articles were "largely factual in nature." 421 U.S. at 802, 95 S.Ct. at 2037.

## II. THE PRETRIAL PUBLICITY

With this background, we consider petitioner's claim that prejudicial pretrial publicity saturated Seminole County. Because the degree of saturation of publicity in Seminole County is relevant, we note the general population characteristics in Seminole County according to the 1970 Census. Seminole County's population was 7,059, and there were 2,117 households. Because the presumed prejudice claim requires an extensive evidentiary showing to warrant relief and because we are required to assess the "totality of the circumstances" in examining the petitioner's claim, an extensive discussion of the pretrial publicity is in order.

There were several sources of publicity in Seminole County in May of 1973. Newspaper coverage constitutes the most significant single source of the pretrial publicity in the record. The *Donalsonville News*, a weekly newspaper with a circulation of 1,800, or approximately 85 percent of the households in Seminole County, was the most widely-distributed newspaper in Seminole County; we examine it first.[3]

In the May 17, 1973 edition of the *Donalsonville News*, headlines read "Community shocked by murder of six members of the Alday family." By the time the May 17,

1973, *Donalsonville News* was published, petitioner Coleman and his co-indictees had already been identified as suspects in the case, and their mugshots were displayed on the front page of the *Donalsonville News*. Similarly, the article identified Coleman and his co-indictees as being escapees from a Maryland prison.

Another front-page article in the May 17 *Donalsonville News* entitled "Authorities conducting intensive search for escapees from Maryland" quoted one of the escapees as stating that he would "kill any policeman who tries to stop us for any reason." The article also noted the possibility that Coleman and his co-indictees might have been responsible for the murder of a Pennsylvania youth, Richard Wayne Miller, whose car was found near the body of one of the victims. The article quoted William Beardsley, the director of the Georgia Department of Investigation, as saying that the circumstantial evidence against the four suspects was overpowering, and "[t]here's no point in looking for anybody else."

A third front-page article in the May 17 *Donalsonville News* described a proclamation issued by the Mayor of Donalsonville requesting all merchants and businesses to close between the hours of 3 and 4 during the funeral to show respect for the victims' family.

Finally, a fourth front-page article described the funeral service which was scheduled for that day.

The May 24, 1973 *Donalsonville News* headlines read "Four are accused of Alday murders." Below the article was a photograph of Carl and Billy Isaacs being taken to the arraignment hearing. The article described how petitioner Coleman had confessed to the killing of a Pennsylvania youth, Richard Miller, and how Coleman

---

**3.** The record does not contain a few of the issues of *The Donalsonville News* that were published between the commission of the crimes and the petitioner's trial. We assume that these issues are not a part of the record because they contained no prejudicial information concerning the petitioner's case. We make the same assumption with respect to the missing issues of the other relevant newspapers.

was to accompany authorities to Pennsylvania to help them search for Miller's body. The article also reported that Peter Zack Geer, the former Lieutenant Governor of Georgia, had been named special prosecutor in the case. In the article, Geer described his prior representation of the Aldays and how he had hunted and fished with two of the victims. The article also reported that at his arraignment, defendant Coleman "seemed to smirk and smile when the district attorney asked if he understood each of the charges against him." The article concluded by noting that there was "considerable talk about the four accused killers getting a fair trial in Seminole County." However, one of the surviving family members was quoted as stating that "[o]ur people in this county are good people ... [t]hey just want to see justice done and I believe the court will take care of that."

Another front-page article in the May 24 *Donalsonville News* reported that two months earlier, Governor Jimmy Carter had approved a new death penalty statute for the state. The article went on to list the circumstances under which the death penalty could be imposed.

The district court viewed a front-page editorial in the May 24 *Donalsonville News* as typical of the publicity surrounding the crime. The editorial states, in pertinent part:

> Some folks say the best thing to do is to refuse to acknowledge a stupid question, but the stupids have been so frequent lately, let's go ahead and put it into print, so maybe they'll hush.

> Yes, the four men suspected and accused of the murder of the six Aldays can get a fair trial in Seminole County.

> And now that you've asked a question, how about answering one: Whatever gave you the idea of asking such a ridiculous question?

> While we're at it, let's go on and say a few words more.

> The four suspects cannot get a passive, indifferent trial here. Nor could any other such characters. But they could get a fair one.

> What's the difference? The people of this community are capable of cooperating with and respecting the various steps toward their trial. They're angry, very angry, about what happened on May 14, and they have never had much use for shiftless, sorry people. They were not the ones who abolished the death penalty and if you had run a survey months before the murders happened you would have found the people here opposed to doing away with it in cases in which the death penalty fits.

> There is a wide difference in the question of whether the people here could give the suspects a fair trial, and in our wanting to see the guilty ones punished and removed from being able to commit the same outrages again, a few years from now, on other innocent people.

> But our people want to be sure that the suspects now being held in jail are the ones who committed the crimes. We don't want to see four innocent men punished, if they should turn out to be innocent of the charges against them, and the other charges to come.

> A man is said to be considered innocent until he is proven guilty. As for whether the people of our community are biased, unfair and not capable of rendering a fair verdict, how about exercising the same courtesy to our people as you offer to a defendant.

> We're innocent of bias and prejudice, until you prove us guilty.

> Wait. There are a few screwballs among us who get a thrill out of talking dumb and sounding off about what all they'd like to do to the four men. No denying this.

> But they're in the extreme minority, and they are pretty well known for their lack of sense.

> Bud Alday spoke the sentiments of his family when he said they didn't want to see anybody else get hurt in this terrible

tragedy that came our way. "Enough people have been hurt already," he said.

The Aldays know how painful such suffering is, and they're wise enough, and concerned enough to not want to see more violence and sorrow.

And there's no room for error here. The only thing that any kind of mob action, or inciting troublesome thoughts can bring is more sorrow.

Think about this often, as the long, drawn-out trial days go slowly along. It's a hard fact of life, and there's no profit in forgetting it. The law must be obeyed.

On page 2 of the May 24 *Donalsonville News* the headline read "Four suspects in Alday murder case left a long trail of trouble, sorrow." The article was a reprint of an article which had appeared earlier in *The Dothan Eagle.* The article began by noting that "[t]he coldblooded trail of a quartet of confessed killers leads to Seminole County again tomorrow, one week after the bullet-riddled bodies of six Alday family members were left in the South Georgia County." Pictures of each of the murder victims accompanied the article as well as a photograph of the six coffins at the funeral. The article continued with a dramatized account of how the murders might have taken place. By the article's own terms, it was "mostly conjecture backed up by evidence collected by a state toxicologist." In the article, petitioner Coleman was reported as having admitted killing the Pennsylvania youth. Similarly, the article described Mrs. Mary Alday's mother, who died from a heart attack several days after the commission of the crime, as another victim. The article also reported that Pennsylvania authorities wanted to question the suspects concerning the death of a Pennsylvania woman who had befriended Carl and William Isaacs when their car broke down near her home. According to the article, "[t]his, authorities say, could bring the number of victims to eight or nine if Mrs. Alday's mother is counted." The article then described Carl and William Isaacs as well as Wayne Coleman as having "started their journey toward their ultimate destiny at Donalsonville when they were quite young." According to the article, the mother of Carl and William Isaacs and Wayne Coleman described the boys as "habitual delinquents and truants" who "lacked respect for their family and stole from their mother and other area homes." A Maryland prison guard was quoted as describing Carl and William Isaacs as well as Wayne Coleman as "just plain mean."

The May 24 edition of the *Donalsonville News* also contained at page 9 a reprint of an editorial from the *Camilla Enterprise.* The editorial began by congratulating law enforcement officials for the swiftness with which they apprehended the suspects. The article then lamented the fact that law enforcement officials were unable to prevent the tragedy from occurring. According to the editorial, "[i]f you review the situation, it will lead you to the conclusion that the last half of the process of treatment and disposition of criminal cases must bear the major portion of the blame." According to the article, for most mass murderers of the last decade "in general not too gross or difficult a punishment has been handed out." The article concluded by noting that,

> There is no single law that will correct our present conditions, nor any quick easy solutions, but there is just no place in society for the kind of individuals who place no value on the life of any other individual with whom they come in contact.
>
> We kill rattlesnakes because they kill anything they come in contact with. We likewise shoot mad dogs or other rabid animals.
>
> When individuals become as these lower animals, they lose their right to human treatment.

Burson, *As We See It*, Donalsonville News, May 24, 1973, at 9, col. 1.

The May 31, 1973, edition of the *Donalsonville News* was headlined "No date set for committal hearings for four accused in Alday murders." The article described the upcoming committal hearing and noted that the trial court had appointed eight lawyers in the area to defend the suspects. The article stated that "[a]pparently none of the eight lawyers named want the job, but under the law in such cases, the judge must appoint defenders for the accused, and there are stiff and severe penalties for attorneys who refuse." The article also described three of the suspects as escapees and noted that Coleman had been flown to Pennsylvania the previous week to "search for the body of the youth he is said to have admitted killing shortly after the prison escape, before the four came to Donalsonville."

On page 2 of the May 31 edition of the *Donalsonville News* the headline read "Police use two psychics in search for body of Maryland high school senior." The article described how Maryland police were using two psychics to attempt to locate the body of Richard Miller, a Pennsylvania youth. The article concluded by noting that "Coleman told police that after he escaped from a Maryland work camp, he shot and killed Miller and left his body beside a road in western Maryland near the Pennsylvania border."

Page 10 of the May 31 edition of the *Donalsonville News* contained a reprint of an editorial in the *Houston Home Journal.* The editorial stated in pertinent part:

> The horrible tragedy that struck the Alday farm family in rural Seminole County last week could have very well occurred right here in Houston County. This just wasn't the route the vicious killers took in their escape from a Maryland minimum security prison.

> The brutal, senseless murders of six members of the Alday family should serve as another warning to all society that there is a need for capital punishment in this country. How can anyone who is aware of this heinous crime, still maintain that capital punishment is too harsh and should be stricken from our society for all time?

> The Alday case is a perfect case for capital punishment. It shows all too well our system of today with dealing with criminals is not working. Three of the persons charged with the execution style killings, escaped from a prison that was preparing them for life on the outside. They were to be released soon back into society. It seems clear that there are some criminals that just cannot be rehabilitated and should not be returned to society to destroy the lives of innocent, hard-working people like the Aldays.

· · · · ·

> Those who oppose capital punishment argue that it is not a deterrent to brutal crimes. But it has been so long since we had an execution in Georgia that there is [sic] really no current statistics for an accurate evaluation. On the other hand, brutal crimes have climbed out of sight in the past several years and that ought to tell the "do-gooders" something about capital punishment.

> Look at it this way. When a person is convicted by the courts beyond a reasonable doubt of a crime like the slaughter of the Alday family, it seems to me there is nothing else society can do. It is absurd to accept the argument that such a criminal can be made to see the error of his ways. As long as such a criminal lives, he is indeed a threat to society. If he is put into prison, he has the opportunity for escape or parole. If he is executed, society has nothing more to fear from such a criminal.

Branch, *Out on a Branch*, Donalsonville News, May 31, 1973, at 10, col. 1.

The June 7, 1973, front-page headline of the *Donalsonville News* read "Body of youth is identified, 7th victim of Alday killers?" The first paragraph of the article reported that the Pennsylvania youth's dis-

appearance "was traced to four men charged with the slaying of the six members of the Alday family in Seminole County on May 14." The article noted that the Pennsylvania youth was killed with a gunshot to the back of the head in the same method used to kill the Aldays. The article further stated that a Maryland state trooper found the body after piecing together information given to him by Carl Isaacs. The article continued on page 2 and noted that the suspects were apprehended near a roadblock in West Virginia after having stolen a car in Alabama and committed an armed robbery in Virginia "after leaving Donalsonville."

The same article also noted that one of the lawyers appointed in the case, Julian Webb, a state senator from the Donalsonville district, had been excused from the case. Senator Webb was quoted as stating, "I absolutely cannot in good conscience, both personally and professionally, defend any of the accused."

Page 6 of the June 7 edition of the *Donalsonville News* reprinted an editorial from the *Baxley News-Banner*. The editorial discussed the need for state Department of Investigation agents to have state-wide arresting powers. According to the editorial, the need "to track down the escaped convicts who brutally killed six members of the Alday family in Seminole County" demonstrated the need for such state-wide arresting powers. According to the article it was "a credit to law enforcement officers that the four criminals were so promptly apprehended and brought back to Seminole County to face life-long friends and relatives of the six members of the Alday family who had been murdered in cold blood."

The June 14, 1973, front-page headline of the *Donalsonville News* read "New lawyers are named to four charged with murder." Except for its implication that the death penalty was appropriate in the case, the article was in other respects merely factual. Another front-page article entitled "Maryland to seek indictments, too," noted that an "Allegheny County (Maryland) prosecutor" indicated that the four suspects would be indicted for the murder of Pennsylvania youth Richard Miller, as well.

The July 12, 1973 headline in the *Donalsonville News* stated: "Attorneys ask hearing for accused in Alday murders." Except for a brief repetition of facts of the crimes, including a reference to finding the nude body of Mary Alday and except for a suggestion that the case could involve the death penalty, the accompanying article contained only a description of procedural steps.

The July 19, 1973 *Donalsonville News* reported in a front-page headline that "Committal hearing time set for accused in Alday case." The article dealt primarily with procedural matters, but did note that the four suspects were not only charged with the murder of the six Aldays but also faced murder charges in the death of the Pennsylvania youth Richard Miller. The article also briefly repeated the facts of the crimes.

The front-page headline in the July 26, 1973 *Donalsonville News* read: "Carl Isaacs Ordered Held for Action of Grand Jury." The article reported that Carl Isaacs was bound over to the Seminole County Grand Jury after a closed committal hearing. Although the hearing was closed to the press and the public, the *Donalsonville News* reported that testimony at the hearing "centered mainly around fingerprints left by the suspects at the mobile home where the five Alday men were slain, and fingerprints found in a car owned by Jerry Alday, which was found abandoned in Livingston, Ala." The article noted the interest of one of the defense attorneys in the constitutionality of the death penalty law, and the fact that Sen. Julian Webb was relieved from appointment in the case because he had sponsored the new death penalty statute. The article again noted that the four suspects were

also charged with the death of Pennsylvania youth Richard Miller. Similarly, the article noted that Mary Alday had been raped and shot in the back of the head as well as noting that the men had been shot in the back of the head. The article also recapitulated the details of the suspects' escape from a Maryland minimum security prison and the details of their arrest in West Virginia. Finally, the article concluded by noting that petitioner Coleman had reportedly confessed to the Pennsylvania murder of Richard Miller.

The August 23, 1973 issue of the *Donalsonville News* contained the front-page headline "Grand jury drawn to serve for special term Sept. 4th." The article briefly described the grand jury procedures and contained no prejudicial information.

In the September 6, 1973 issue of the *Donalsonville News*, the headline read "Grand jury returns total of 19 charges in Alday cases." The bulk of the article was factual and described the indictments returned by the grand jury, although the article did remind readers that the suspects' "arrest climaxed a massive manhunt that carried the men from their escape from a Maryland prison on May 10 down the Atlantic seaboard, westward through Seminole County, to western Alabama, and back through Kentucky and Tennessee before they were arrested in Lynch, West Virginia."

The September 13, 1973 issue of the *Donalsonville News* contained the headline "Lawyers seek changes for accused in Alday slayings." The headline and much of the article was factual and nonprejudicial, describing how attorneys for William Isaacs had sought to get his case transferred to juvenile court, and indicating that attorneys for Carl Isaacs had filed a motion for change of venue. However, the article again noted that the suspects' "arrests climaxed a massive manhunt that carried the men from their escape from a Maryland prison on May 10 down the Atlantic coast, westward through Seminole County, to Liv-

ingston, Ala., and back up through Kentucky and Tennessee before they were arrested in Lynch, West Virginia." The article also indicated that the suspects were accused of "several other crimes along that route, including the murder of a Pennsylvania youth and at least two counts of armed robbery." The article also reprinted a letter from the trial court judge to the attorneys for Carl Isaacs which cautioned the attorneys about "trifling with the Court." Among other things, the letter stated:

I think that now is a good time to get this message to you. I expect you and your law partner to do everything within your power to defend your client, but at the same time I expect you to respect the Court and not to undertake to trifle with the Court. In short, what I have reference to here is that in your Motion for Change of Venue you request that the trial be held in one of several place outside of the Pataula Judicial Circuit and several places beyond the limits of the State of Georgia. I notice in the Press that your law partner in his press release or in a statement to the press recognized the fact that this could not be done. Why it was done I do not know. I call to your attention that you came into this case voluntarily and you are welcome in this case and always welcome to practice law in the Pataula Judicial Circuit and I assure you that the court at no time will be disrespectful to you or your associates or clients nor to anyone else intentionally. I will not tolerate any trifling with the Court by you or anyone else.

The October 11, 1973 *Donalsonville News* front-page headline read "Judge Geer sets December date for Alday murder trial." The article reported the upcoming trial dates and noted that the trial judge had denied the defendants' motion for change of venue. Although the article primarily reported procedural aspects of the case, the article did remind readers that each of the victims "had been shot several times in the back of the head." The article

also noted that Mary Alday's body had been found in the woods on a neighboring farm and that she had been shot and raped.

The December 27, 1973 *Donalsonville News* front-page headline read "Accused in Alday Murders Go on Trial Here Monday." The article first reported that Billy Isaacs had pleaded guilty to charges of burglary and armed robbery the previous Friday. The article then noted in five separate instances that Billy Isaacs was expected to be a key witness in the prosecution's case. They read:

He [Billy Isaacs] is expected to be a key witness for the prosecution in the coming trials, according to a reliable source.

．　．　．　．　．

Billy Isaacs, 16, one of four Maryland men charged in the Alday family slayings in Seminole County, is expected to be a key witness for the prosecution against his brothers and a third companion whose trials are scheduled to begin Dec. 31.

．　．　．　．　．

Young Isaacs, who has been confined in the Randolph County Jail at Cuthbert since late May, could well be the only eye witness to the crime available to the prosecution.

．　．　．　．　．

Isaacs has also reportedly issued a statement to lawmen describing the slayings of Ned Alday, his three sons, Jimmy, Jerry, and Chester, his brother Aubrey, and his daughter-in-law, Mary Campbell Alday.

．　．　．　．　．

Although informed courthouse sources maintain the younger Isaacs will be a key witness against his companions, special prosecutor Peter Zack Geer, of Albany, Saturday declined comment on the possibility that the youth will be called to testify.

The article also noted that the four suspects "were arrested in West Virginia following a robbery attempt in neighboring Virginia." In addition, the article stated that "Coleman has also admitted the slaying of a 19-year-old Pennsylvania youth, Richard Miller."

The January 3, 1974 *Donalsonville News* front-page contained pictures of Carl Isaacs and the two sets of opposing lawyers. The front-page headline read "First Alday murder trial underway. Billy Isaacs testifies on events that took place May 14; Carl Isaacs first to face jury." Among other things, the article noted that the special prosecutors retained to assist in the prosecution of the case, Mr. Geer and Mr. Lee, were "longtime friends of the victims of the May 14th slayings, and of their families." The article then noted that Carl Isaacs' attorney, Bobby Hill, "indicated his primary purpose [in taking the case] is to test the state's new capital punishment law." The article also reported that the prosecution was expected to ask for the death penalty in each of the three pending cases. The article then published the names and occupations of each of the jurors selected in Carl Isaacs' case. The article also reported that most of special prosecutor Geer's questioning of prospective jurors centered on the death penalty and stated that jurors who indicated any opposition to the death penalty were struck by Mr. Geer. The article stated that prospective jurors who indicated a strong belief in capital punishment were struck by the defense. The article also noted that "[d]ozens of reporters from newspapers, radio and television stations and wire services were on hand to cover the trial, part of the story that was selected as the second biggest story in the entire state last year." The article also indicated that fingerprint experts from the state crime lab testified that Carl Isaacs' fingerprints were found at the murder scene. The article noted that Mary Alday's watch was found in the possession of one of the defendants and was introduced as evidence in the case. The article indicated that Carl Isaacs remained expressionless, "even when he glanced at en-

larged photographs of the dead Aldays his attorneys were studying." Finally, the article concluded by noting that the state's "objective will be to prove each of the men had a part in the murders, without emphasizing which man pulled the trigger on which particular victim."

Also appearing on the front page was the headline "16-year-old Billy takes stand and tells of tragic 'spree' of violence they brought to the Aldays." In its entirety, the newspaper account of Billy Isaacs' testimony read as follows:

Billy Isaacs took the stand Wednesday morning to outline just how the six members of the Ned Alday family were killed on May 14.

He said that the "spree" started out in Baltimore, Md., and ended up at Jerry Alday's mobile home about 4 p.m. on May 14.

Billy testified that Wayne Coleman and Carl Isaacs went into Jerry's unlocked mobile home when no one was home. While they were in there, Billy said two men in a blue jeep came to the mobile home and they were forced at gunpoint to go inside the trailer.

Billy said he forced the older man to empty his pockets and that Carl took a pen knife, wallet, some change and a cigarette lighter from the younger man who apparently was Jerry Alday since Carl asked him if he was married and lived in the trailer residence.

The younger man said he did live in the mobile home and that he was married and his wife would soon be home. He said the man begged Carl not to hurt her.

Carl took one of the men into the south bedroom and Wayne took the other in the north bedroom, Billy said. Shortly thereafter he heard shots in both bedrooms.

Just about the time that Carl and Wayne came back to the kitchen a "middle-aged" man pulled into the yard on a John Deere tractor. Billy said he got off the tractor and knocked on the closed back door. Then Carl opened the door and stuck a gun in his face and made him come into the trailer.

Billy said Carl made the man take off his green coveralls, sunglasses and hat and then took him into the living room where he made him lie face down on the sofa. The younger Isaacs said Carl then shot the man one time in the head.

A short time later Mary Alday arrived at the trailer and Carl who was moving the tractor, came around back of her, stuck a gun in her back and forced her into the mobile home.

Billy said that while Carl was going through the woman's purse two men in a green pickup truck drove into the yard. Billy said he and Carl ran around the trailer and came up on each side of the pickup from the back side. He said Carl stuck a gun in the driver's face and both men were forced into the mobile home.

The men were made to sit on the floor, and Mary, who was standing beside the doorway told them that the man in the living room was hurt.

Carl then took Dungee and Mrs. Alday in a bathroom, he said. Then he came back and took one of the men in the south bedroom and Wayne took the other man in the north bedroom.

Billy said there were shots in the north bedroom but only clicking noises in the south bedroom because Carl's gun was empty. He said Carl came back into the kitchen and grabbed his .38 cl. pistol and went back into the bedroom where two shots were fired.

"He came out laughing," Billy said. "Carl told us 'that bastard begged me for mercy.' "

Billy said he went outside with Wayne to help them transfer "their stuff" from their car to Mrs. Alday's automobile. When he went back inside Mrs. Alday was lying on the floor with the bottom part of her pants suit off and her top around her neck. He said Carl was

standing by the table with his pants down.

Later Mrs. Alday was forced to go with the four men. She left the trailer fully clothed but with a handkerchief around her eyes and mouth and her hands tied behind her.

Billy said they went down the road a ways after pushing off their car with Mary's car, but that Wayne discovered he had lost his wallet and they went back to the trailer home to get it.

Then, Billy said they went to some woods and "wiped" their car of fingerprints.

He said that Mrs. Alday was raped several times in the clearing before she was shot.

Then all four got into Mrs. Alday's car and went to Alabama.

The January 10, 1974 issue of the *Donalsonville News* contained the front-page headline "Two found guilty in Alday murders. Third man to go on trial here next Monday morning." Under the headline was a picture of Dungee between two major articles. The article on the left was headlined, "Carl Isaacs, 19, first to hear jury's verdict of death by electrocution," and reported that the jury took only 68 minutes to find the defendant guilty of murder and only 38 minutes to decide that he should receive the death penalty. The article then noted that the jurors struggled for two hours to render a verdict which was considered acceptable under the law. According to the article, "[t]here were no indications of any waivering or doubt by the members of the jury, and on the seventh effort the correct verdict was entered into the court records." The article then noted that Carl Isaacs' attorneys contemplated an appeal in the case. The article stated:

Hill [Isaacs' attorney] made no secret that he took the case as a part of his battle against the death penalty, and not because he thought Isaacs and his companions were innocent. He made no effort to proclaim and establish innocence during the trial.

In his statements to the jury, Hill and Farrington seemed to be basing all their efforts toward admitting Isaacs was guilty of the charges against him, but there should be no death sentence. Instead, he claimed the defendant should be placed in prison and studied.

The article also reported that in Carl Isaacs' case, the jury found aggravating circumstances of robbery, burglary, rape, and kidnapping. The article also stated that defendant Carl Isaacs yawned when special prosecutor Geer asked the jury to impose the death penalty in his closing argument.

A second front-page article, to the right of Dungee's picture, in the January 10 *Donalsonville News* was entitled "George Dungee, 35, second on trial, found guilty of May 14th murders." After reporting that the jury had returned the death penalty in Dungee's case, the article stated "Dungee made no signs of emotion. In fact, remarked one observer, he looked bored." The article noted that the jury took 58 minutes to reach the guilty verdict, and approximately 2 hours to return the death sentence. The article also reported that although Dungee actually pulled the trigger on only one victim, the jury found him guilty on all six counts because state law "provides for guilt of all aiding and/or abetting such crimes." As in the Carl Isaacs case, all the names of the jurors on Dungee's panel were listed in the newspaper. The article stated that "Billy Isaacs testified Tuesday that he personally saw prison escapee George Dungee assault and kill Mrs. Mary Alday last May, after her husband and four other Alday men had been murdered earlier in the day." The article recounted how "Billy again went through a detailed description of the execution-style murders of the six Aldays after he, Carl, Dungee and Wayne Colemen arrived at the mobile home of Mary and Jerry Alday, last May 14th." The article also

noted that, despite special prosecutor Geer's remark in his opening statement that he intended to introduce a confession from Dungee, he failed to do so after defense attorneys said that they would move to suppress the confession. The article also contained a detailed account of Billy Isaacs' testimony in the Dungee case. It stated:

> Billy said that after he and the other three men took Mrs. Alday to the woods where they forced her to take off her clothes, he saw Dungee assault the young woman, later forcing her to lie face down on the ground and shooting her twice in the back.

> Billy testified that Carl initially handed Coleman a pistol to shoot Mrs. Alday with, but then Dungee commented, "What about me?"

> Billy said Coleman "shrugged his shoulders," handed the pistol over to Dungee, who then forced Mrs. Alday to walk a short way from them and shot her.

> The younger Isaacs boy said that after Dungee had shot Mrs. Alday, he reached down and took her Timex wrist watch from her arm and put it in his pocket. Other testimony during the day had indicated that the stolen watch was the same one found on Dungee when he and the other three men were arrested in West Virginia.

A third front-page article in the January 10, 1974 issue of the *Donalsonville News* was headlined "Trial of Wayne Coleman, 26, to open at 9:30 in Seminole Superior Court," and was accompanied by a picture of Coleman. After noting petitioner Coleman's upcoming trial date, the article reminded readers of the fact that Coleman also faced charges in Maryland in the death of a Pennsylvania youth, Richard Miller. The article stated that the Pennsylvania youth "was slain with a gunshot wound in the back of the head, the same method used to kill the Aldays." Finally, the article noted that petitioner Coleman, Carl Isaacs, and George Dungee were all escapees from a Maryland prison.

*The Albany Herald* was also distributed in Seminole County and had a daily circulation of 518. It contained numerous stories concerning the Alday case.

The May 15, 1973 front-page headline in *The Albany Herald* read "Family of Six Discovered Slain Near Donalsonville." The article recounted how the bodies of six members of the Alday family had been discovered. The article noted that there were few leads at that point, but that one witness told police that Mrs. Mary Alday was seen leaving her home yesterday and being followed by three "hippie types." The article concluded with a quotation from Seminole County Coroner Paul Mosley in which he stated that "[t]his is something that sounds like the wild West. Things like this just don't happen here. These are things that you read about that happen in places like Chicago."

The May 16 edition of *The Albany Herald* contained the front-page headline "Seminole Killers Object of Nationwide Dragnet." Pictures of the four suspects were placed immediately beneath the headline. The first sentence of the article identified three of the four suspects as escaped convicts. The article also stated that the suspects were believed to have abducted a Pennsylvania youth, Richard Miller. According to the article, "[o]fficials also said several other unsolved slayings along the Eastern Seaboard may be linked to the four." The article also noted that "the three escapees were serving terms for convictions of crimes ranging from robbery to burglary."

Another article at page 5 of the May 16 *Albany Herald* was headlined "One of Victims Shot 7 Times." The article quoted Coroner Paul Mosley as stating that "[y]ou can cover the bullet holes with a half dollar."

Another front-page article in the May 16 *Albany Herald* was entitled "Couldn't Think of Nobody Disliking Them." The article began by noting that the "slaughter of a quiet, clean-living farm family has left

their southwest Georgia neighbors in enraged shock." A local resident, speaking of the deceased victims, stated that he "couldn't think of nobody disliking them." The article generally described the high esteem neighbors held for the Alday family. The article also noted that the four suspects sought in connection with the killings were escapees from a Maryland prison.

The May 17 *Albany Herald* contained the front-page headline "Alday Vehicle Found in Alabama. Reports on Suspects Pour In." The article began by noting that "sorrowing Seminole County witnessed the mass funeral service for the Alday family." The article noted that the Alday car had been found near Livingston, Alabama, and stated that "three escaped convicts and a fourth person [were] being sought in connection with the most brutal mass slayings in Georgia history." In the same article, Georgia Division of Investigation Director William Beardsly indicated that a fingerprint found at the scene of the crime had been identified as belonging to Carl Isaacs. Beardsley further described circumstantial evidence against the four suspects as "overpowering" and stated "[t]here's no point in looking for anybody else."

Another front-page article in the May 17 *Albany Herald* was headlined "Grieving Family Ponders Slaying of Six Loved Ones. Governor Offers Assistance." In the article, a special assistant to Governor Jimmy Carter indicated that the slaying "was perhaps the worst crime in Georgia history."

In a third article on page 5 of the May 17 *Albany Herald*, the headline read, "Sheriff Wants Revenge but Beholden to Badge. 'I'd Precook Them.'" The article quoted Sheriff Dan White as follows:

If I had my way about it, I'd have me a large oven and I'd precook them for several days, just keep them alive and let them punish.... And I don't think that would satisfy me.

The article continued and stated that "[t]he integrity of the twenty-year veteran of law enforcement, however, overrides such emotion." Sheriff White stated:

Whenever I'm protecting them, I'm going to do my job and bring them to court, and I hope they'll get justice.

.     .     .     .     .

I don't see where they could put up any plea for mercy.... The acts of these men are lower than animals.

If a citizen gets out of hand and starts shooting people up, there's only one way to arrest and that's with a shotgun.

Any man that believes in God believes in capital punishment.... I could throw the switch to the electric chair and never lose a minute's sleep.

Another page 5 article in the May 17 *Albany Herald* was headlined "Suspects Reported in Texas," and quoted a Texas service station operator as having spotted the suspects in east Texas. In the same article, a Georgia official was reported as stating that there was ballistics evidence that the four suspects had killed the members of the Alday family.

The May 18 front-page headline of *The Albany Herald* read "Seminole Slay Suspects Caught in West Virginia." The article generally recounted the manner in which the suspects were apprehended in West Virginia and noted that the police roadblock was set up after the four men robbed a grocery store across the border in Virginia. In the article, Sheriff Dan White was reported as having stated that the suspects would not be jailed in Seminole County when they were brought to Georgia "because of ill feeling among residents of the rural community." Sheriff White stated, "They will be jailed outside of Seminole County. I have an obligation to protect everybody. I want them brought to court. I want them brought to justice." The article indicated that the defendants had been involved in a crime spree along the Eastern Seaboard, and that additional charges against the four suspects would probably include murder in Pennsylvania, auto theft in Alabama, and robbery in Virginia.

Another front-page article in the May 18 *Albany Herald* was headlined "Deserve What They Get: Mother of Slay Suspects." The first sentence of the article quoted the mother of Carl and Billy Isaacs and Wayne Coleman as stating "[t]hey are old enough to know right from wrong and deserve what they get when captured." The article also noted that Isaacs, Coleman and Dungee were escapees from a Maryland prison where Isaacs and Coleman were serving terms for burglary and Dungee was serving a sentence for contempt of court. The article concluded with a quote from Mrs. Isaacs, "[t]hey had no respect for their family and those people in Georgia. How can they expect any from us?"

Another front-page article in the May 18 *Albany Herald* contained the headline "Mrs. Alday's Mother Dies at Colquitt." In the article, a local physician stated that "complications arising from Mrs. Campbell's diabetic condition and grief over her daughter's slaying probably caused her death."

A fourth front-page article in the May 18 *Albany Herald* was headlined "Thousands Attend Biggest Funeral Ever in Sowega." According to the article, "[i]t was by far the largest funeral ever conducted in Southwest Georgia." The article described dignitaries attending the funeral as including Tommy Irwin, State Agriculture Commissioner; Mrs. Jimmy Carter, the governor's wife;[4] Hugh Broom, Chairman of the State Board of Transportation; and Cloyd Hall, a special assistant to Governor Carter.

The May 19 edition of *The Albany Herald* was headlined "Alday Slay Suspects to be Returned to Donalsonville." The front-page article generally described how the suspects had waived extradition to Georgia, and it also noted that the four would likely face charges of escape in Maryland, murder in Pennsylvania, armed robbery in Virginia, and auto theft in Alabama. In the same article, Coleman was reported to have confessed to an FBI agent to the murder of Pennsylvania youth Richard Miller. When asked why the Pennsylvania youth was killed, Coleman was reported as stating because "he didn't want any witnesses." In the same article, Georgia Division of Investigation Director William Beardsley stated that it would be up to Sheriff Dan White as to where the suspects would be placed when they arrived in Seminole County. Beardsley added, however, that he disagreed with reports that the suspects might not be safe in Seminole County. Beardsley stated, "I don't believe there are that kind of people down there. I think they will be adequately treated."

The May 20 edition of *The Albany Herald* contained the front-page headline "Sheriff Maintains: Seminole Jail Inadequate to Hold Slaying Suspects." In the article, the sheriff was reported as saying that the inadequacy of the Seminole County Jail was the sole reason for the suspects being held outside Seminole County and that fear of mob vengeance had nothing to do with the decision. Despite Sheriff White's remarks, the article stated that "[h]owever, residents have talked of lynching since the bodies of the six were found in a mobile home of the Alday farm early Tuesday. Some have mentioned other forms of extreme punishments for the killers." In the article, the prospect of a change of venue was mentioned and Sheriff White stated his belief that the four would stand trial in Seminole County. The sheriff further remarked, however, that "[i]f it were left up to me, I'd like to go ahead and try them today and get it over with." The headline in another front-page article in the May 20 *Albany Herald* read "Gun Sales on Rise in Rural Seminole." In the article, local gun store operators reported that there had been a noticeable increase in the sale of firearms in Seminole County.

---

**4.** News reports conflict on the subject of which of Governor Carter's relatives attended the funeral. *The Atlanta Constitution* reported that his mother, Mrs. Lillian Carter, attended. *See* p. 1519, *infra*.

Pictures of the four suspects being led to their extradition covered the front page of the May 22 edition of *The Albany Herald* and a headline read "Four Arraigned Without Incident." The article generally recounted the security precautions taken by police in transporting the suspects to their arraignment hearing. The article, however, also reported petitioner Coleman's confession to the murder of Pennsylvania youth Richard Miller. Coleman was again quoted as stating that Miller was killed because they did not "want any witnesses." The article concluded by noting that Peter Zack Geer, former Lieutenant Governor of Georgia and a personal friend of the victims, had been hired by the surviving members of the family to act as a special prosecutor in the case.

Another front-page headline in the May 22 *Albany Herald* read "Donalsonville Slay Suspect Snickers as Charges Read. Army of Lawmen Guards Men." According to the article, talk of vengeance was the reason why numerous state troopers and Georgia Department of Investigation officers were on hand to escort the prisoners to the arraignment hearing. The article reported that "Coleman threw his head back slightly and snickered" when asked whether he understood the charges against him. The article also noted that when the arraignment hearing was completed, and Coleman was escorted toward the door, his "eyes stopped on a female reporter from one of the wire services who had been sitting on the back row of the jury box." The female reporter was then quoted as saying, "I don't like the way he looked at me. God, did you see the way he looked at me?" The article also quoted special prosecutor Geer as stating that he had a "special interest" in the case since he had known the Aldays for a long time and had hunted and fished with two of the victims. The article concluded by noting that Geer would help in the prosecution of what had been described as the "worse [sic] crime in Georgia history."

On page 6 of the May 23 edition of *The Albany Herald* the headline read "First

Day's Search for Body Futile. Suspect 'Unable or Unwilling.'" The article described how petitioner Coleman had been taken to Pennsylvania to assist in locating the body of Pennsylvania youth Richard Miller. The article also noted that Coleman reportedly confessed to the killing of Miller to eliminate witnesses who might later identify him.

An article on the front page of the May 24 *Albany Herald* was headlined "Alday Suspects Could Face Death." The article noted that a newly enacted state death penalty law could be applied to the four suspects. The article also indicated that three of the suspects, Carl Isaacs, Coleman, and Dungee, were escapees from a Maryland prison. The article stated that Coleman was serving a ten-year sentence for robbery; Isaacs, a four-year sentence for burglary; and Dungee, an eighteen-month sentence for contempt of court.

The May 25 edition of *The Albany Herald* contained front-page headlines: "Judge Names Attorneys for Alday Slay Suspects. Nobody Wants Job." The article recounted how the trial court had named eight attorneys to defend the four accused but that "apparently none of the eight want the job." Attorney Harold Lambert was quoted as stating that "[t]his is the worst thing that's ever happened to me professionally. There's just no way I can get out of it. I pleaded with the judge for about 15 minutes yesterday but he apparently didn't see any of my reasons as either legal or valid." Other attorneys were quoted as stating that "they planned to provide the best courtroom defense, but with 'reluctance.'" The article also recounted how state senator Julian Webb of Donalsonville "does not want the job." According to the article, Webb stated that he should be excused from the case because of his close relationship with the victims' family and because of his sponsorship of the Georgia death penalty statute, which would likely be at issue in the case.

The May 26 *Albany Herald* contained an article at page 5 which was headlined "Psy-

chic Pair Leads Lawmen in Search for Missing Youth. Alday Slay Link." The article described how Maryland and Pennsylvania authorities had used two psychics to try and locate the body of a Pennsylvania youth, Richard Miller. The article noted that the youth "is believed to have been murdered by Wayne Coleman." The article concluded by noting that "Coleman told police that after he escaped from a Maryland work camp, he shot and killed Miller and left his body beside a road in western Maryland near the Pennsylvania border."

Another article at page 5A of the May 26 *Albany Herald* contained the headline "Blakely Lawyer Also Protests Alday Slayings Defense Role." In the article, attorney Tracey Moulton complained of the law which required Superior Court judges to appoint counsel for indigent defendants. Although Moulton's complaints focused on the "terrible financial burden" that representation of petitioner Coleman would impose, he was also quoted as stating that attorneys appointed to defend the four suspects would face a "loss of money and friends." Of the eight attorneys appointed to represent the defendants, the article stated that "all say they did not want to become actively involved in the defense."

At page 5 of the June 4 edition of *The Albany Herald* the headline read "Seventh Victim of Alday Suspects Said Found. In Pennsylvania." The article briefly reported how the body of Pennsylvania youth Richard Miller had been found near the Pennsylvania-Maryland border. The article also stated that "[i]n a confession to the FBI, Wayne Coleman, 26, said he shot and killed Miller after he and his three companions commandeered the victim's car near here."

In the June 8 edition of *The Albany Herald* an article on page 3 was headlined "Hoe Hands for Alday Work Sought." The article briefly recounted how volunteers were needed to help hoe the peanut fields on the Alday farm.

An article on page 6B of the June 13 edition of *The Albany Herald* started with the headline "Bainbridge Attorney Happy With Alday Slay Case Relief." In the first sentence of the article, attorney J. Willis Conger "summed up his feelings of a court order releasing him as co-counsel" by stating, "[s]ince the judge signed the order at noon yesterday there's nothing anybody could say to me that could make me mad." The article also stated that "[a]ll eight [appointed attorneys] have voiced strong protests over their appointments." The article also noted that the substituted lawyers volunteered as part of their attempt to overrule the newly enacted death penalty statute.

The June 14 issue of *The Albany Herald* contained an article headlined "Father's Day Dedicated to Alday Family." The article on page 17A briefly recounted how Father's Day in Seminole County had been declared "Alday Memorial Day." On that day, all churches in the county were to take up a special collection for the Alday Memorial Fund to be used for a new sanctuary for the Spring Creek Baptist Church.

An article on page 12B of the June 22 edition of *The Albany Herald* was headlined "Alday Slay Suspects Did Not Ask for Committal Hearing, Foster Says." In the article, district attorney Ralph Foster stated that the four suspects have not requested a committal hearing. Foster was quoted as saying that the four "will be indicted for murder." The district attorney further stated that he had "no doubts the four suspects would receive a fair trial in Donalsonville." The district attorney was quoted as saying that he was "sure the jury will listen to the defense of these attorneys. A person is entitled to a good defense [and] a lawyer of their choice."

Headlines for an article which appeared in the July 5 edition of *The Albany Herald* stated: "Alday Case Could Test Death Pen-

alty." [5]  In the article, attorney Harold Lambert was quoted as stating that "if they [the defendants] are found guilty I believe this case will be used to determine whether the state's death penalty law will stand up before the Supreme Court." The article continued, noting that the newly-enacted Georgia death penalty statute had not yet been subjected to appellate court scrutiny.

Headlines for an article which appeared in the July 6 edition of *The Albany Herald* read "Closed Hearing Sought for Alday Slay Suspect." The article on page 10A described how attorneys for Carl Isaacs were seeking a closed committal hearing to limit press coverage in the case and assure their client's right to a fair trial. In addition to the factual and nonprejudicial description of the request for a closed committal hearing, the article also noted that murder charges had been filed against petitioner Coleman in the death of a Pennsylvania youth, Richard Miller. The article stated that both "Georgia and Pennsylvania authorities say Coleman admitted killing Miller after the youth attempted to stop him, the elder Isaacs, and Dungee shortly after they escaped from a Maryland minimum security prison." The article continued, noting that Carl Isaacs' attorneys, Hill and Farrington, "earlier said ... [they] had 'volunteered' to represent Isaacs in an effort to continue their fight against a new, but yet untested capital punishment bill passed by the general assembly."

A front-page article in the July 19 edition of *The Albany Herald* contained the headline "Closed Preliminary Hearing Set for Alday Slay Suspect." Although the article focused on nonprejudicial procedural matters, it also reported the facts of the crimes, the Isaacs' defense attorney's interest in challenging the new death penalty statute, and noted that petitioner Coleman had been charged with the murder of Pennsylvania youth Richard Miller and that Miller's car was found near the body of Mrs. Mary Alday.

An article in the July 21 edition of *The Albany Herald* was headlined "Attorneys Await Outcome of Slay Suspect's Hearing." The page 5A article described how attorneys for all the suspects other than Carl Isaacs were awaiting the evidence presented at Carl Isaacs' preliminary hearing before deciding whether they would request similar proceedings for their clients. According to the article, "[s]everal of the eight court-appointed attorneys representing the four defendants have voiced reluctance at accepting the cases but now say they have no choice but to follow the court order."

A front-page headline in the July 22 edition of *The Albany Herald* read "Alday Slay Suspect to Face Grand Jury," accompanied by a photograph of Carl Isaacs. The article briefly recounted how Carl Isaacs was bound over to the grand jury at his committal hearing. Although the hearing was closed, the article stated: "[t]estimony Saturday [at the hearing] centered mainly around fingerprints left by the suspects at the mobile home where five of the six bodies were found and fingerprints found in a car owned by Jerry Alday, which was found abandoned in Livingston, Ala." Once again, the article stated that "Coleman reportedly told police of an earlier murder in which a Pennsylvania youth was slain when he attempted to recover a stolen pickup truck from the elder Isaacs, Coleman, and Dungee."

An article on page 9A of the August 7 *Albany Herald* contained the headline "Remaining Alday Slay Suspects Face Hearing." The article began by stating that security at the upcoming hearing was expected to be heavy. The article quoted "a court spokesman who asked not [to] be identified" as stating that the major portion of the testimony at the committal hearing previously held for Carl Isaacs centered around fingerprints found at the victims' trailer and similar evidence found in a car stolen from the house.

**5.** The page on which the article appeared can-   not be ascertained from the record.

A subsequent article appeared on page 8A of the August 8 edition of *The Albany Herald* and was headlined "Security Stringent at 3 Alday Slay Suspects' Hearing." The article began by indicating that security was heavy at the preliminary hearing held for the three remaining suspects. The article also stated that the state expected to call four witnesses at the hearing "to present evidence found at the death scene and in a stolen automobile." The article then recounted how the suspects were arrested when they attempted to break through a roadblock "erected after Virginia law enforcement officials reported a car they were chasing had crossed into West Virginia following an armed robbery." The article then noted that petitioner Coleman was also accused of the murder of a Pennsylvania youth, Richard Miller.

The headline for a page 7A article in the August 9 edition of *The Albany Herald* stated: "Three Alday Slay Suspects to Face Grand Jury Action." The article began by noting that the three remaining suspects were bound over for grand jury action at their preliminary hearing. The article again stated that "[t]estimony reportedly centered around fingerprints found at the murder scene and in a car stolen from a mobile home where five of the victims were found." The article also noted that the four suspects were arrested when they attempted to break through a road block set up by West Virginia authorities after they were notified that Virginia authorities were pursuing four men suspected of the armed robbery of a Virginia store. The article further recounted that "Carl Coleman also told investigators that he had killed a Pennsylvania youth shortly after he, both Isaacs and Dungee had escaped from a Maryland prison."

A front-page headline in the Sunday, August 26 edition of *The Albany Herald* read "Attorney for Alday Slay Suspects Says He Will Ask Venue Change." The article indicated that Carl Isaacs' attorney, Bobby Hill, stated that he intended to seek a change of venue if his client was indicted by the grand jury. The article noted Isaacs' attorneys' interest in the case as an opportunity to challenge the new death penalty statute, and also noted that three of the four suspects were escapees from a minimum security prison in Maryland, that Coleman was also charged with another murder in Pennsylvania, and that Coleman reportedly confessed to the murder of the Pennsylvania youth to FBI agents.

A headline on page 20 of the August 28 edition of *The Albany Herald* read "Second Alday Slay Suspect Attorney Says He Will Request Venue Change. Hits Newspaper Accounts." The article described how attorney Harold Lambert indicated that he would request a change of venue for petitioner Coleman. In the article, Lambert indicated that he planned to use news stories from *The Albany Herald* to support his claim that prejudicial publicity prevented his client from receiving a fair trial in Seminole County. Unlike the previous articles describing procedural maneuverings in the case, however, this article contained no recapitulation of the suspects' arrest, the Pennsylvania murder, or Coleman's confession to the Pennsylvania murder.

A front-page article in the September 4 edition of *The Albany Herald* read "Suspects in Alday Killings Face Multiple Indictments." The article began by describing how each of the suspects would be indicted for six counts of murder and one count each of kidnapping, armed robbery, and burglary. The article also indicated that defendants Carl Isaacs, George Dungee, and Carl Coleman would also be indicted for rape. The article then stated that the suspects "were charged in the multiple slayings shortly after they were arrested on an armed robbery charge by West Virginia State Police." The article then indicated that petitioner Coleman had also been charged in the murder of a Pennsylvania youth, Richard Miller, whose car was found near Mrs. Alday's body.

A front-page article in the September 5 edition of *The Albany Herald* contained the headline "Lawyers for Accused Alday Killers Want Venue Change." The article described how attorneys for the four suspects were beginning their efforts to obtain a change of venue. The article was primarily factual and contained no prejudicial information concerning the defendants. The September 11 and September 14 issues of *The Albany Herald* contained similar nonprejudicial accounts of the defense attorneys' change of venue motions. A September 19 front-page article similarly dealt with motions to disqualify the trial judge, although that article also noted that the special prosecutor was hired by the family, that the defendants were escapees, and that Coleman had also been charged with the murder of the Pennsylvania youth.

The headline for an article in the September 21 edition of *The Albany Herald* read "Alday Slay Case Venue Change Hearing Thursday." The article on page 9A told how attorneys for the suspects were seeking to have the trial moved outside Seminole County. The article also described how petitioner Coleman's attorneys had filed a motion for the trial judge to disqualify himself because of his relationship to special prosecutor Peter Zack Geer. The attorney was quoted as stating that he filed the motion primarily for "self protection." Attorney Lambert was quoted as stating that "[i]f Carl Wayne Coleman is found guilty I don't want anyone to say he had an incompetent attorney that did not request the judge to step down because he was the uncle of the prosecuting attorney." Finally, the article noted that special prosecutor Geer was hired by the surviving members of the Alday family to aid in the prosecution of the four suspects. A similar article on page 5A of the September 22 edition of *The Albany Herald* was headlined "Second Alday Slay Defense Hearing Slated in Seminole." The article described how hearings on motions filed in Coleman's case were scheduled to be heard the same day as those previously filed in Carl Isaacs'

case. According to the article, Lambert filed a motion to disqualify the trial judge "because he did not want his client to charge him with overlooking the relationship between the judge and the special prosecutor if convicted in the slayings."

Finally, the headline in a front-page article in the September 27 edition of *The Albany Herald* read "Judge Won't Step Down in Alday Slaying Trials." The article described how the trial judge refused to disqualify himself due to his relationship to special prosecutor Geer. As with the earlier articles, this article stated that attorney Lambert filed the motion "mainly to protect himself from any future criticism."

An article in the September 28 *Albany Herald* was headlined "Judge Geer Delays Alday Slay Case Trial Venue Change Ruling." The page 9 article indicated that the trial judge would delay ruling on defense attorneys' motions for change of venue. The article summarized the arguments at the change of venue hearing and contained no prejudicial information.

An article in the September 30 edition of *The Albany Herald* contained the headline "Alday Ruling Expected Monday on Defense Motions." The article on page 6A focused primarily on procedural matters, but also repeated the facts of the crimes and noted that the four suspects "became the targets of a nationwide manhunt within hours after the [victims'] bodies were discovered," and that law enforcement officials "identified the four as suspects from fingerprints found in a car abandoned near Mrs. Alday's body." Similarly, an October 2 article dealt with procedural matters, although it did refer to Coleman and the other suspects as escapees from a Maryland prison.

A front-page article in the October 5 edition of *The Albany Herald* was headlined "Alday Slay Trial Delay Predicted." Although the article focused on procedural matters, it also indicated that Carl Isaacs' attorneys had been reprimanded for "trifling" with the court by requesting that the trial be moved outside Georgia.

An article in the October 7 edition of *The Albany Herald* was headlined "No Trial Date in Alday Case." The page 14A article briefly noted that Seminole Superior Court was set to convene on Monday but that there had been no indication that the trial of the four suspects would commence on that day. The article contained no prejudicial information.

The headline in a front-page article in the October 10 edition of *The Albany Herald* read "Judge Nixes Venue Change for Alday Slay Defendants." The article described how the trial judge denied defense attorneys' motions for a change of venue. The article told how special prosecutor Geer had argued that "pre-trial publicity does not constitute grounds for a change of venue according to two federal court rulings." The article also noted that the trial judge overruled a second motion by defense attorneys for Carl Isaacs to delay the trial at least 18 months in order that the effects of publicity might dissipate. Generally, the article merely described procedural maneuverings in the case, except for a brief repetition of the facts of the crime including the fact that Mary's body was found nude.

An article in the November 29 edition of *The Albany Herald* was headlined "Alday Slay Suspect Hearing Cancelled." The article began by noting that a hearing on defense motions to exclude certain evidence in the case had been cancelled after special prosecutor Geer agreed not to enter the disputed material into evidence. Geer was quoted as stating that "I didn't really need the letter anyway." The article again recounted that the elder Isaacs, Coleman, and Dungee were escapees from a Maryland prison and that all three also faced murder charges in Pennylvania.

An article in the December 5 edition of *The Albany Herald* contained the headline "Slain Husband, Sons 'Did Everything Together.'" Portions of the article read as follows:

> Mrs. Ned Alday walked down the dirt path from the house her husband had constructed in 1945.

> She stopped, wiping tears from her eyes, looking as lonesome as any woman has ever looked.

> The auctioneer was about to begin bidding for farm machinery her sons had accumulated. In the end, the sale would net more than $33,000, but Mrs. Alday wouldn't get the money.

> A daughter-in-law, Barbara Alday, had requested the auction.

> .    .    .    .    .

> "They worked all their lives for this," she said, wiping her eyes.

> .    .    .    .    .

> "They did everything together," she said, speaking of Ned and her sons. "They joined the church together, they were baptized together, they were ordained as deacons together and they died together."

> She talked about their last night alive.

> .    .    .    .    .

> "We never dreamed someone was going to come along and try to kill everybody," she said. "Somebody comes along who does not like to work and tries to take everything away from us."

In a front-page article in the Saturday December 22 edition of *The Albany Herald,* the headline read "Youth in Alday Slay Case Gets 40-Year Prison Term, State Sets Aside Murder Charges." Under the headline was a picture of Billy. The first sentence of the article stated that "Billy Wayne Isaacs, 16, late Friday admitted his involvement in the Seminole County Alday slay case and now faces a 40-year prison sentence." The article described how the youth received the sentence upon entry of a guilty plea to charges of armed robbery and burglary. The article further indicated that murder charges against Billy Isaacs were dropped and stated that "Court sources said the youngster may be one of the prosecution's key witnesses when the murder trials begin Dec. 31." "Court officials said the youth had issued a statement

describing the slayings in detail." The article also stated that the "elder Isaacs, Coleman and Dungee were escapees from a minimum security Maryland prison when the murders occurred." The article continued, noting that petitioner Coleman had also been charged in the slaying of Pennsylvania youth Richard Miller.

A front-page headline in the December 23 edition of *The Albany Herald* stated "Billy Isaacs Expected to Be Key State Witness in Alday Slay Trial." The first sentence of the article noted that the young Isaacs was "expected to be a key witness for the prosecution against his brothers and a third companion whose trials are scheduled to begin Dec. 31." According to the article, "[y]oung Isaacs ... could well be the only eye witness to the crime available to the prosecution." The article further stated that "[a]lthough attorneys for the prosecution said they can present a strong case based on circumstantial evidence they could produce no eyewitnesses to the slayings." The article continued, noting that "Isaacs has also reportedly issued a statement to lawmen describing the slayings of ... [the victims]." The article also stated that Carl Isaacs, George Dungee, and petitioner Coleman "were arrested in West Virginia following a robbery attempt in neighboring Virginia." According to the article, "Coleman has also admitted the slaying of a nineteen-year old Pennsylvania youth, Richard Miller."

The headline in an accompanying article on page 11A of the December 23 edition of *The Albany Herald* read "Alday Slay Figure's Mother Recalls Days of Nomadic Boyhood." In the article, Isaacs' mother, Mrs. Betty Isaacs, recounted how the family had moved from one place to another during Billy Isaacs' childhood. The article contained some favorable, humanizing information about Billy and noted that Billy Isaacs "is reported by Maryland authorities to have a less extensive record than his brother, Carl, and half-brother, Wayne Coleman, charged in the Alday slayings."

The article stated that Billy Isaacs was resting at his mother's home "when his brothers and a black companion picked him up and began their crime spree." According to the article, Maryland authorities were reluctant to discuss Billy Isaacs because of the "disappointment and embarassment that the state could have severely misjudged the 15-year old." In the article, one Maryland official stated, "Don't ask me anything else. I don't want anybody saying I messed this up. You know how law is."

In another article in the December 23 edition of *The Albany Herald,* the page 9D headline read "Ice Storm, Alday Slayings Head Georgia's Top Stories of Year." According to the article, "[t]he brutal murder of a South Georgia farm family was selected as the No. 2 story of the year."

A subsequent article in the December 27 edition of *The Albany Herald* was headlined "Alday Slay Suspect Faces Arraignment." The article on page 8A told how petitioner Coleman was the only one of the three remaining defendants to request an arraignment. The article also indicated that Billy Isaacs "is expected to be called as one of the prosecuting key witnesses against his companions." The article stated that murder charges were filed against Coleman in Pennsylvania "after Coleman told agents of the Federal Bureau of Investigation and other law enforcement officers the [Pennsylvania] youth was killed when he attempted to interfere in the theft of a pick-up truck." The article concluded by noting that Coleman, Isaacs, and Dungee "are charged with killing the Pennsylvania youth shortly after escaping from a Maryland prison."

On Sunday December 30, 1973, the day before Carl Isaacs was to go on trial, pictures of Carl Isaacs, George Dungee, and Wayne Coleman all appeared on the top of the front page of the *The Albany Herald.* The caption accompanying petitioner Coleman's photograph stated: "Wayne Coleman, Pennsylvania Slaying." The front-

page headline in *The Albany Herald* read "'Going to Be One Hell of a Court Session.' Alday Slay Trials. Begin Monday." The first sentence of the article stated that "[o]ne of Georgia's most widely-publicized murder trials is to begin here Monday." One official was quoted as predicting that "[i]t's going to be one hell of a court session." In the article, a special assistant to Governor Jimmy Carter described the slayings as "the worst crime in Georgia history." The article then named the defendants as facing possible death sentences and noted that they were escapees from a Maryland prison. The article then indicated that the first clues in the case came from fingerprints found inside the mobile home which "led to the identification of the four men believed involved." According to the article, "[f]ingerprints both inside the mobile home and those found in an abandoned car near Mrs. Alday's body were identified as those belonging to the four Maryland men by the Federal Bureau of Investigation." The article also told how an armed robbery at a small country store in Virginia and the ensuing highspeed chase "led to the apprehension of the four." The article also recounted how Coleman was taken to Pennsylvania "to aid in the search for a nineteen-year-old youth he reportedly said was killed while attempting to stop the escapees." The article also indicated that although rumors of mob action were heard in Southwest Georgia shortly after the four were returned, no overt threats were ever made.

In the December 31 edition of *The Albany Herald* a front-page headline read "Alday Slay Trial Jury Selection Process Begins." The article indicated that the jury selection process in Carl Isaacs' case had begun and described the restrictions placed upon the press by the trial judge. Other than reciting the facts of the crimes and noting that Carl Isaacs, Dungee and petitioner Coleman were escapees from a Maryland prison, the article referred only to procedural matters.

A headline with picture on the front page of the January 1 edition of *The Albany Herald* read "Widow's Ordeal Ending?" The article began by describing how surviving members of the victims' family, who sat on the third row of the Seminole County courthouse, "[had] been waiting seven months to find out what happened in the house trailer on the afternoon of May 14." According to the article, the prosecution announced it would put an eyewitness to the crimes on the stand. The article then described the composition of the prosecution team and noted that Mr. Alto Lee, "offered his services as a special prosecutor because of his close relationship to the family in the past." Newsmen were quoted in the article as asking "[w]hy so many big guns for such an airtight case?" Special prosecutor Geer responded by stating that he thought the "case is much more important than most people realize." According to the article, Geer was "talking about the case becoming a test of a state law enacted last March that reimposes capital punishment in Georgia and is applicable in the case of the Alday slay suspects."

Another front-page article in the January 1 edition of *The Albany Herald* was headlined "Brother of 2 Victims Leads Off Testimony. Found Aldays' Bodies." The article described how a surviving member of the Alday family who found the victims' bodies led off testimony in Carl Isaacs' trial. This article also noted that special prosecutor Geer stated that he expects to introduce an eyewitness in the case. The article then explained that the eyewitness "would be Billy Isaacs, 16-year-old brother of Carl, who already has pleaded guilty to burglary and robbery charges." The article reminded readers that Geer was retained by the surviving members of the Alday family to act as a special prosecutor in the case. The article also described how the trial judge had taken special precautions to insure that potential jurors in the remaining two cases did not attend Carl Isaacs' trial.

The headline in a third front-page article in the January 1 edition of *The Albany*

*Herald* read "Seminole Family Slayings Top Sowega Headliner." The article briefly recounted how the slaying of the Alday family was the area's top story of the year.

The January 2 edition of *The Albany Herald* contained a front-page headline, with pictures of the attorneys for both the prosecution and defense, which read "They Killed Alday Family, Younger Isaacs Tells Court, Billy Relates Travels." The first sentence of the article described how Billy Isaacs testified that "his older brother Carl and two other men methodically shot to death all five male members of the Alday family as they came into a mobile home." According to the article, Billy Isaacs "also testified about the rape and slaying of Mrs. Mary Alday, the sixth member of the prominent Seminole County farm family the four suspects have been accused of killing last May." The article also noted that Dungee and Coleman were charged along with Isaacs and indicated that all three were escapees from a Maryland prison. The article then recounted all the details of Billy Isaacs' testimony. The article indicated that Carl Isaacs and Coleman had killed the first two victims, that Dungee had killed Mary, and included a description of Billy's account of how Carl Isaacs came out of one of the bedrooms laughing after killing one of the victims and proclaimed, "[t]hat damned bastard begged for mercy." The article also related Billy's description of how Mrs. Mary Alday was repeatedly raped before she was shot to death. The article also spoke of the ballistics and fingerprint evidence presented at Carl Isaacs' trial. The article also summarized other testimony presented in the state's case against Carl Isaacs.

A headline on the front page of the January 3 edition of *The Albany Herald* stated "Seminole County Jurors Find Accused Mass Murderer Guilty," and was accompanied by a picture of an Alday family member and another picture of several jurors. The article described how the jury came back with a verdict of guilty and had re-

tired to deliberate on the sentence. The article also told how attorneys for petitioner Coleman moved the court to suppress the jury's verdict in Isaacs' trial until the other two trials were conducted to prevent the verdict from influencing future juries. The article noted that the trial judge's overruling of the motion was "apparently based on a Georgia law which requires court procedures to be held in 'public and open court.'" The article also told readers how Billy Isaacs had "told a horror tale beginning when his brothers picked him up at a residence in Baltimore County, Md., where they began their crime spree, though the Alday slayings and on to their capture in West Virginia." The article again quoted Billy Isaacs' testimony in which he stated that Carl Isaacs went into the bedroom and shot one of the victims and "came out laughing, and Carl said to me, '[t]hat damn bastard begged for mercy.'" The article noted that the Alday women and others in the courtroom wept openly.

Another article on top of the front page of the January 3 edition of *The Albany Herald* was headlined "Billy Had 'An Urge' to Be With His Brothers." The article was accompanied by pictures of Billy and Carl Isaacs. The first sentence in the article described how "two half brothers and a black companion slipped from the window of the minimum security prison on the Eastern Shore of Maryland and managed to arrive at the brothers' Baltimore County home before lunch the next day." The article also recounted how the suspects "stole a car and drove into Pennsylvania, to an area where they once had lived." According to the article, once in Pennsylvania, petitioner Coleman killed Pennsylvania youth Richard Miller "if his alleged confession is to be believed." The article described Miller as "a country boy, a young man who would have graduated from a small high school in three days." The article then noted that the four suspects fled south, "robbing stores along the way." The article also detailed the events of the last days of the victims' lives. The

concluding portion of the article quoted a "community leader" as follows:

We have witnessed one of the worst crimes in this section of the country, and had I had to speculate before this happened, I would have said our people would have taken the law into their own hands. I would have been wrong. There are a few rhetorical bullies here and there, but they wind up only crying for our friends. This has overwhelmed us. We are yet to be convinced that it happened.

In the January 4 edition of *The Albany Herald,* headlines read "Isaacs Sentenced to Die; Lawyers Planning Appeal, Execution Date of Feb. 15 Ordered." The front-page article began by noting that Carl Isaacs had been found guilty and sentenced to death. The article noted that the four suspects "were originally charged with the murders following an interstate crime spree that ended when they were arrested in West Virginia." The article described Billy Isaacs as "the most damaging prosecution witness in his older brother's trial." In the article, the wife of one of the victims expressed her approval of the death sentence and stated that the suspects "deserved more." Another family member was quoted as saying "So far, so good. Ask me later," which the article indicated referred to the upcoming trials.

Another front page article in the January 4 edition of *The Albany Herald* was headlined "Carl Just Looked at Jury. 'Been Good to Know You.'" Over the article was a picture of Carl Isaacs, captioned in part: "Showed little emotion." The article stated that the death sentence did not seem to bother Isaacs, and that he had shown little emotion throughout the trial. The article described how Carl Isaacs' attorneys planned to appeal the verdict and sentence. The article also told how other inmates in the prison sang "So long, it's been good to know you ..."

In the Sunday January 6 edition of *The Albany Herald,* a front-page headline read "Dungee Next to Face Jury in Seminole Alday Deaths." The article began by reporting that George Dungee was the next of the suspects expected to go to trial. The article also noted that Carl Isaacs had been found guilty and sentenced to death the previous week. Speaking of Carl Isaacs' trial, the article stated that "the high point in the trial came when sixteen-year-old Billy Isaacs took the stand describing in chilling detail the murders of the Alday family." The article told how Billy Isaacs had "described an eastern seaboard crime spree through Maryland, Pennsylvania, West Virginia, North Carolina, South Carolina, Georgia, and Florida." The article also indicated that petitioner Coleman "is charged with the murder of a nineteen-year-old Pennsylvania youth who reportedly attempted to stop the four suspects when he saw them stealing a pickup truck." According to the article, which was published on the day before Dungee's trial was to begin, Billy Isaacs "pointed to Dungee as the man who murdered Mary Alday in a wooded area about six miles north of the mobile home." In the concluding paragraph of the article, court officials were reported as having stated that the evidence to be presented against Dungee was "almost identical" to that in Carl Isaacs' trial.

A front-page headline in the January 7 edition of *The Albany Herald* read "Selection of Dungee Jury Begins in Slay Trial Today." The article began by noting that jury selection in George Dungee's trial was set to begin that day. This article also described Billy Isaacs' testimony the previous week as "the most damaging testimony" presented against his brother, Carl Isaacs. The article described Billy Isaacs' testimony as painting a "chilling picture" of the slayings. According to the article, Billy Isaacs "told of seeing Mary Alday raped inside the trailer and later in a wooded area some miles away where her body was found." The article stated that "[s]he was shot to death by Dungee." The concluding portion of the article reminded

readers that "[t]he elder Isaacs, Dungee and Coleman are all escapees from a Maryland prison farm."

Another article in the January 7 edition of *The Albany Herald* was headlined "Mother Says Her Sons 'Deserve Punishment.'"[6] The article told how Mrs. Betty Coleman Isaacs has "little sympathy left for her sons and hasn't bothered to answer their letters since they were jailed in Georgia." Mrs. Isaacs was quoted as stating that her sons "deserve whatever punishment they receive," and that they "had no right to hurt those people down there." According to the article, Billy Isaacs' testimony "pictured Carl as a merciless killer in his eyewitness description of the killings." The article also stated that Billy's testimony "also implicated his and Carl's half-brother, Wayne Coleman, 26, and George Dungee, 35." This article also reminded readers that Carl Isaacs, Wayne Coleman, and George Dungee were escapees from a Maryland prison.

The January 8 edition of *The Albany Herald* contained a front-page headline "Prosecution to Offer 'Confession' of Dungee," and was accompanied by a picture of several jurors leaving the courthouse. The article described how special prosecutor Geer planned to introduce a confession by George Dungee in his trial. The article also noted that defense attorneys planned to object to the introduction of the confession. This article indicated that Billy Isaacs' "chilling testimony was instrumental in the guilty verdict and death sentence given his 19-year-old brother Carl Isaacs at the conclusion of a sensational trial last week." The article indicated that Billy Isaacs was also expected to testify for the prosecution in George Dungee's trial. Finally, the article noted that petitioner Coleman was still awaiting trial and that he "has also been implicated in the slaying of a 19-year-old Pennsylvania youth, Richard Miller."

The front-page headline in the January 9 edition of *The Albany Herald* read "Dungee Found Guilty of Six Murder Counts." The article was accompanied by a picture of Bud Alday, and another picture of Dungee. The article began by noting that George Dungee had also been found guilty and sentenced to death. The article referred to the special prosecutor's closing argument in which he waved "Mary Alday's turquoise pantsuit and bra, which were found near her nude body." According to the article, Billy Isaacs "told the Dungee jury the same harrowing eyewitness account of the murders he related last week in his brother's trial." After Mary Alday was raped by Carl Isaacs and Coleman in the kitchen, and when she was taken into the woods, Dungee asked, "What about me?" The article then quoted Billy Isaacs' testimony stating that Dungee "took her into the woods, shot her twice and was getting ready to shoot her a third time," when the others stated, "That's enough."

In the January 10 edition of *The Albany Herald,* a front-page headline read "Coleman Goes on Trial Monday." The article described how Carl Coleman and George Dungee had already been found guilty and sentenced to death. The article again noted that Billy Isaacs "was the state's most damaging witness."

In another front-page article in the January 10 edition of *The Albany Herald,* an attorney for George Dungee discussed his personal opposition to capital punishment—"it is not good for society"—and stated that his closing argument during the sentencing phase was easier because of his opposition to the death penalty. The article contained a full summary of the attorney's argument opposing capital punishment, based on religious and historical grounds.

In the January 10 issue, at page 6A, there was an article based on an interview with Dungee's mother, after she learned of his scheduled execution, which was favorable to Dungee, tending to humanize him.

---

6. The page on which the article appeared cannot be ascertained from the record.

A front-page headline in the Sunday January 13 edition of *The Albany Herald* read "Difficult Task Foreseen Picking Last Murder Jury." The article appeared below a picture of Coleman peering from behind bars. The article began by noting that petitioner Coleman's trial was set to begin the next day and stated that attorneys expected jury selection to be a difficult task. This article also noted Billy Isaacs' testimony in the previous trials and stated that the "younger Isaacs said that Coleman and Isaacs killed Ned, 62; his three sons, Jerry, 35, Chester, 32, and Jimmy, 25; and his brother, Aubrey, 57, at the trailer."

*The Dothan Eagle* also published numerous reports about the Alday case; it had a daily circulation of 315 in Seminole County.

In the May 15 edition of *The Dothan Eagle*, front-page headlines read "6 Members of Alday Family Slain in Seminole County. Five Men, Woman Shot 'Face Down.'" The article described how the six members of the Alday family were systematically executed the previous day.

The May 16 edition of *The Dothan Eagle* contained the front-page headline "Four Being Sought in Grisly Slayings Near Donalsonville. 3 Believed Maryland Escapees." The article began by noting that three of the four suspects in the killings were escapees from a Maryland prison. One escapee was quoted as stating that he would "kill any policeman who tries to stop us for any reason." The article noted the possibility that Pennsylvania youth Richard Miller was the seventh victim of the killers. The article also indicated that at the time of his escape, Carl Isaacs was serving a four-year sentence for breaking and entering and robbery, that Coleman was serving a ten-year sentence for armed robbery, and Dungee an eighteen-month sentence for contempt of court. The suspects' mug shots accompanied the front page article. The article also quoted William Beardsley, Director of the Georgia Department of Investigation, as stating that circumstantial evidence against the four suspects was "overpowering," and that "[t]here's no point in looking for anybody else."

A front-page headline in the May 17 edition of *The Dothan Eagle* read "Mrs. Alday's Car Found in Alabama; Manhunt Goes On." The article was accompanied by a photograph of Carl Isaacs which was captioned "Carl Isaacs. Fingerprints Found...." The article reported that Mrs. Mary Alday's automobile had been found in Livingston, Alabama. The article also indicated that a fingerprint found at the scene of the crime had been identified as belonging to Carl Isaacs and identified Isaacs as an escapee from a Maryland prison. Georgia Department of Investigation Director William Beardsley was quoted as stating that "[t]his confirms our feeling on the subject." The article then repeated Beardsley's quote from the previous day stating that circumstantial evidence against the four was "overpowering," and that "[t]here's no point in looking for anybody else." The article also noted that Mrs. Mary Alday had been raped and tortured before she was shot to death in the back of the head.

The May 18 edition of *The Dothan Eagle* contained the front-page headline "4 Sought in Alday Slayings Caught. Trio Found Asleep, One Nabbed Earlier." The article indicated that the four suspects were captured when police put up "a roadblock to stop four men who robbed a grocery store across the border in Virginia." According to the article, Sheriff White said the four would not be jailed in Seminole County "because of ill feeling among the residents of the rural community." The article quoted Sheriff White as stating:

> They will be jailed outside of Seminole County. I have an obligation to protect everybody. I want them brought to court. I want them brought to justice.

The article concluded by noting that the suspects were escapees from a Maryland prison and also stated that police expected to question the four in connection with the disappearance of Pennsylvania youth Rich-

ard Miller. Another front page article described the funeral for the victims which had taken place the previous day.

A front-page headline in the May 20 edition of *The Dothan Eagle* read "Alday Slayers Have Appointment with Justice." The article began by noting that the "cold-blooded trial of a quartet of confessed killers leads to Seminole County again tomorrow, one week after the bullet-riddled bodies of six Alday family members were left in the South Georgia county." The article described how on the previous Monday the killers "probably saw Mary Alday open the trunk of her 1970 blue and white Chevrolet Impala automobile to let a bag boy put a couple sacks of groceries in for her." The article then stated, "[t]hey [the suspects] must have liked the looks of the car. They liked the looks of its driver." The article described how authorities found Pennsylvania youth Richard Miller's automobile near the body of Mary Alday and subsequently found some of Miller's personal effects in the trunk of Ms. Alday's stolen car, which was located in Livingston, Alabama. According to the article, this led officials to "presum[e] there must also be a victim No. 7." According to the article, the four suspects got as far north as Slate Creek, Virginia, where "they gave out of money" and "found an easy mark—a Slate Creek grocery store—and robbed it of about $3000 and several guns." The article further stated that "Coleman, under questioning by the FBI at Bluefield, admitted killing the 19-year-old McConnellsburg youth." The article then stated:

> The admission confirmed authorities' worst fears. Miller was dead.
>
> Other victims? Ms. Mary Aldays' mother had died several hours earlier in a Colquitt, Ga., hospital after suffering a heart attack.

.    .    .    .    .

Pennsylvania authorities want to question them [the suspects] concerning the death of Mrs. Anne Elder, fifty-eight, of Stewartstown, Pa., last January. Police said that a short time before her death she had befriended Carl and William Isaacs when their car broke down near her home.

This, authorities say, could bring the number of victims to eight, or nine if Mrs. Alday's mother is counted.

A front-page headline in the May 21 edition of *The Dothan Eagle* read "Alday Massacre. Accused Facing Six Counts Each." The article began by indicating that each of the suspects was charged with six counts of murder. The article also stated that during their arraignment, "Coleman agreed to carry authorities to a spot near Hagerstown, Md., and show them the body of a seventh victim."

The May 22 edition of *The Dothan Eagle* contained the front-page pictures of Coleman and Dungee and a headline "Alday Massacre Four Wait; One Helps Hunt Seventh Body." The article began by noting that Coleman had been taken to Pennsylvania to assist in the search for a Pennsylvania youth, Richard Miller. According to the article, "Coleman, who is said to be the ring leader, reportedly has admitted shooting 19-year-old Richard Wayne Miller of McConnellsburg." The article then described the committal hearings held for the four and stated that petitioner Coleman "seemed to smirk and smile when the district attorney asked if he understood each of the charges against him." The article also noted that Peter Zack Geer, former Lieutenant Governor of Georgia, would assist in the prosecution of the case. According to special prosecutor Geer, he had represented the Aldays on numerous occasions and had hunted and fished with two of the victims.

The May 23 edition of *The Dothan Eagle* contained a front-page article entitled "New Link Forged in Alday Massacre." The article reported that "[a]uthorities in McFarlan, N.C., told Seminole County Sheriff Dan White the four men charged with the slayings robbed a grocery store near there the Wednesday before the Aldays

were killed." The article also described how Coleman had been taken to Pennsylvania to assist in the search for the body of Richard Miller. According to the article, the "FBI said Coleman ... told agents of Miller's death."

A front-page article in the May 24 edition of *The Dothan Eagle* was headlined "Alday Killers Could Get Electric Chair in Georgia." The article began by noting that if convicted, the four suspects in the Alday case could face the death penalty. The article then described how three of the four suspects were escapees from a Maryland prison. The article then listed the ten aggravating circumstances which, under the Georgia statute, might justify the imposition of the death penalty.

In the May 25 edition of *The Dothan Eagle* front page headlines read "The Alday Case. Webb Appointed But Desires 'Off.'" In the article, Webb articulated two reasons for his desire to be excused from the appointment. According to Webb, his sponsorship of the state's new death penalty law would preclude him from challenging it during the trials. Speaking of the possibility of his defending one of the accused, Webb stated "I believe I can't in good conscience—personally and professionally—because those people were neighbors and personal friends of mine." Another attorney, speaking of his appointment, stated "I've objected. I objected at the time Judge Geer called me. But as far as I'm concerned, I've been appointed. I will give him the very best that I have. I have that ethical and legal obligation." The article also quoted Attorney J. Willis Conger as stating:

> I'd like very much to be relieved. I don't know of any lawyer in Georgia who would want that case. I don't know of anybody who would want it.
>
> I feel the feeling in Seminole County and this part of Georgia is such that I don't want it. It's not the kind of case I want to get involved in. Right now, I plan to ask to be relieved.

A front-page headline in the June 4 edition of *The Dothan Eagle* read "Alday Case. Body of Youth Found in Maryland." The first sentence of the article stated that "[t]he body of Richard Wayne Miller, 19-year-old McConnellsburg, Pa., youth whose disappearance May 10 had been traced to four men charged with the massacre of six members of the Ned Alday family, was found yesterday about eight miles south of Flintstone, Md." The article described petitioner Coleman as "another of the suspected Alday slayers who FBI spokesman said has admitted killing Miller." The article concluded by naming the four suspects and noting the fact that three of the four were escapees from a Maryland prison.

An article in the June 14 edition of *The Dothan Eagle* was headlined "Alday Case Seen as Death Law Test." [7] The article began by noting that the Alday case "may become a test case for Georgia's new capital punishment law." Carl Isaacs' attorney, Bobby Hill, was quoted as stating that "[i]t is the kind of murder case that the legislature obviously intended for the new death penalty to be applied in." Hill and Farrington were further quoted as stating that one of the reasons they volunteered was because "there was just nobody who was willing to give them the kind of defense they are entitled to under our system of law." A concluding paragraph in the article noted that three of the defendants escaped from a Maryland prison farm just before the slayings.

A front-page article in the July 6 edition of *The Dothan Eagle* was headlined "Closed Hearing Plea Made in Alday Case." Except for a brief recapitulation of the facts of the crime, the article merely described procedural maneuverings in the case. A similar front page article appeared in the July 19 edition of *The Dothan Eagle* although this article did note that each of the victims was shot in the back of the head, and that Mrs. Mary Alday had been raped.

---

7. The page on which the article appeared can-   not be ascertained from the record.

Another front-page article in the July 22 edition of *The Dothan Eagle* was captioned "Isaacs to Await Grand Jury Action." The article began by noting that defendant Carl Isaacs was bound over for action to the Seminole County Grand Jury. The article was primarily a factual account of the proceedings surrounding Isaacs' committal hearing although the article did state that "[i]n addition to the six charges against the Isaacs, Coleman and Dungee, they are charged with the death of Richard Wayne Miller, 19, of McConnellsburg, Penn., whose car was found near the body of Mrs. Mary Alday."

A front-page article in the August 8 edition of *The Dothan Eagle* was captioned "3 Have Hearings in Alday Massacre." The article was a factual account of the committal hearings for the three remaining suspects and contained no prejudicial information. A similar article appeared on the August 9 front page.

A front-page article which appeared in the September 4 edition of *The Dothan Eagle* was headlined "Grand Jury Studying Alday Case." The article reported that the Seminole County Grand Jury was meeting to consider murder charges against the four suspects. The article named the four suspects and stated that three of the four were Maryland prison escapees. The article also stated that the "FBI said Coleman has also admitted killing Richard Wayne Miller, a 19-year-old high school senior from Pennsylvania."

In the September 18 edition of *The Dothan Eagle* the headline for an article read "Change of Venue Asked For Isaacs." The article briefly told how attorneys for defendant Carl Isaacs requested a change of venue for the upcoming trial. The arti-

cle contained no prejudicial information other than extensive quotations from the previously referred to letter from the trial judge to the attorneys cautioning them not to "trifle with the court." A similar article captioned "Venue Change For Isaacs Is Sought," appeared in the September 26 edition of *The Dothan Eagle* but contained no prejudicial information.[8] The same is also true of a September 27 article which appeared on the front page of *The Dothan Eagle* which was captioned "Alday Case Judge Stays on Bench."

A front-page article in the September 28 edition of *The Dothan Eagle* was headlined "Court Studying Change of Venue." The article gave a brief summary of the arguments presented at the change of venue hearing. The article also recounted how defense attorneys sought discovery of all favorable evidence held by the prosecution. According to the article, special prosecutor Geer stated that he had no objections to surrendering the favorable evidence but he was quoted as stating that "I must say that it ain't much." [9]

In May of 1973, *The Atlanta Journal* had a daily circulation of 106 in Seminole County. The daily circulation of *The Atlanta Constitution* in Seminole County was 178, with the Sunday paper circulation being 563.

The May 15 edition of *The Atlanta Journal* [10] contained an article captioned "Killers Strike at Mobile Home." [11] The article was primarily a factual account of the scene of the crime.

An article which appeared on page 1A of the May 16 edition of *The Atlanta Constitution* was headlined "Slayings Leave Town in Shock." The first sentence of the article quoted a local resident as stating,

---

8. The page on which the article appeared cannot be ascertained from the record.

9. The record contains no articles from *The Dothan Eagle* subsequent to the September 28 edition mentioned above. The change of venue hearing was held on September 27.

10. Articles appearing in *The Atlanta Journal* and *The Atlanta Constitution* are discussed together.

11. Pages on which many *Atlanta Journal* and *Atlanta Constitution* articles appeared cannot be ascertained from the record. Page citations are made when available.

"Six Murders in Donalsonville Ga. That's something that happens in California, not a little town like this. It's unbelievable!" The article went on to describe how local residents held members of the Alday family in high esteem. However, the article contained no prejudicial information concerning the defendants.

In an article which appeared on the front page of the May 16 edition of *The Atlanta Journal*, a local resident "summed up the feelings" of the residents of Seminole County when he stated: "I feel sorry for them fellows if they get caught around here, I don't think they'll make it to jail." According to the article, "[f]eeling in the shocked community tended towards the theory that outsiders, like the three convicts who are suspected, must have done the killing." One woman was quoted as stating, "[t]hey're like animals. No one around here would even want to do something like that."

Another article which appeared on the front page of the May 16 edition of *The Atlanta Journal* was headlined "Few Slayings in Georgia Out-Total Seminole's Six." The article began by noting that the slaying of the Alday family members was Georgia's second largest mass murder. The article then described other mass murders which had taken place in the past within Georgia.

In an article which appeared on page 1A of the May 16 edition of *The Atlanta Constitution*, Dr. Larry Howard, director of the state crime lab, was quoted as stating that the Alday murders were the "biggest deliberately planned homicide in Georgia." The article then noted that three of the four suspects were escapees from a Maryland prison.

An article which appeared on page 1A of the May 17 edition of *The Atlanta Journal* described how Mrs. Mary Alday's automobile had been found in Livingston, Alabama. The article stated that three escapees from a Maryland work camp and the brother of one of the escapees were "prime suspects" in the mass slaying. The article also stated that a "fingerprint found on a window of an abandoned car near the raped and shot body of Mrs. Alday has positively been identified as belonging to Carl Isaacs, one of the hunted suspects." The article also implied that the four might be involved with the disappearance of a Pennsylvania youth, Richard W. Miller. In the article, Gil Kelley, radio station owner and a member of the Seminole County Grand Jury, stated that "[i]f a report came now that these men were holed up in a wooded area, I don't think any of them would get out alive." Nonetheless, Kelley maintained that if the four were captured, they would receive a fair trial in Donalsonville. Sheriff Dan White, referring to the gruesome manner in which Mrs. Alday was killed, stated that the killers were "animals and should be treated as such," and were "lower than a dog." Sheriff White asked, "[C]an you name me any animal that doesn't protect its females?" Sheriff White further stated:

> If I had my way about it, I would have me a large oven and I'd pre-cook them several days, just keep them alive and let them punish. And I don't think that would satisfy me.

> .    .    .    .    .

> It's not my job to prejudge the case, let's leave it to the court and the jury do that.

An accompanying article appeared in the May 17 edition of *The Atlanta Journal* and quoted Ms. Betty Isaacs as stating "Respect is what my sons lacked. They had none for their family and those people in Georgia and how can they expect any from us?"

A front-page headline of the May 18 edition of *The Atlanta Journal* read "Grieving Donalsonville Relieved by Captures." The article began by describing the sense of relief felt by the citizens of Donalsonville upon learning of the capture of the four suspects. Gil Kelley, a radio station

owner and a member of the county grand jury, was quoted as stating that the "killers should be put away from society" because "[w]ith a death sentence there would be so many appeals it could be watered down, and they might get out in seven years. We don't want that." However, Tuddy Alday, a son of Everett "Bud" Alday, expressed his desire for a harsher penalty and stated, "I think the killers ought to be killed." When asked whether a fair trial was possible in Seminole County, Mr. Alday said, "[t]hey'll get a fair trial but they don't deserve it for what they done." The article concluded with a quotation from Sheriff White on the possibility of trial taking place elsewhere. He stated:

There's blood boiling all over the nation about this. You name me a state where if they [the captured suspects] broke loose, people wouldn't want to hurt them.

There's no other place for it [the trial] to be held except in Seminole County.

An article on page 1A of the May 18 edition of The Atlanta Constitution described the manhunt in the West Virginia mountains for three of the fugitives. The article told how George Dungee had been apprehended the previous evening. The article then described the manhunt which was taking place for the remaining fugitives. Seminole County Sheriff Dan White was quoted as stating that "[t]hey [the suspects] were running, just like I figured. They're too cowardly to fight." The article also quoted Mrs. Betty Isaacs as stating that her sons were "old enough to know right from wrong and deserve what they get when captured." The article also indicated that the four were suspected in the murder of a Pennsylvania youth.

Another front-page article in the May 18 edition of The Atlanta Constitution described the funeral which was held for the six victims. According to the article, the funeral was the biggest in Seminole County history. The article also indicated that dignitaries attending the funeral included Mrs. Lillian Carter, mother of Governor Jimmy Carter; State Agriculture Commissioner Tommy Irwin; Department of Transportation Chairman Hugh Broome; State Senator Julian Webb; and Cloyd Hall, a special assistant to Governor Carter. The article specifically noted, however, that none of the ministers speaking at the funeral called for revenge for the murders.

Another article which appeared in the May 18 edition of The Atlanta Journal reported how Maryland prison authorities described the four suspects as having histories of unstable family life, repeated burglaries, excessive drinking, and frequent escape. According to the article, two of the suspects "have been involved with homosexuality." The article described how petitioner Coleman was the only one of the four with a record of violence in the past. The article told how he was serving a ten-year sentence for armed robbery when he escaped. The article concluded by giving a detailed arrest record for each of the four suspects.

Another article which appeared in the May 18 edition of The Atlanta Journal described the arrest of the four suspects in West Virginia. The article was primarily a factual account of the suspects' arrest.

Finally, a third article which appeared in the May 18 edition of The Atlanta Journal described the funeral for the victims. The only reference to the four suspects came when one minister prayed for God's mercy on "everyone of these men who had anything to do with this destruction ... we hope that before they close their eyes in death they will see themselves for what they are."

A front-page headline in the May 19 edition of The Atlanta Constitution read "Suspects in Alday Killings Brought Back to Georgia." The article described how the three remaining suspects had been apprehended in the mountains of West Virginia and how they were brought back to Georgia. Colonel Ray Pope, Director of

Public Safety, was quoted as stating that the killings were the "most horrifying crime that has ever been committed in our state." Another Department of Investigation official stated that the "climate in Seminole County is not conducive to keeping them [the suspects] in the jail there." Sheriff White was also quoted as stating that "[t]here's not a doubt in my mind that lynching has crossed the mind of everybody. I'd like to try 'em in court this afternoon if I had them down there." Nonetheless, although Sheriff White stated that "everybody's blood is boiling," he maintained that the suspects could still get a fair trial in Seminole County. He stated:

> We believe in God. We believe in law and order. And we want the court to have a chance to show the world that we will deal out justice. All we want is to see justice done.

The article also indicated that three of the four suspects were escapees from a Maryland prison, that fingerprints of two of the suspects had "definitely been found at the scene of the crime in Seminole County," and that "FBI agents Friday night said that, under questioning in Bluefield, W.Va., Friday, Coleman told about the death of Miller, a high school senior who has been missing since May 10."

An article which appeared in the May 19 edition of *The Atlanta Constitution* was captioned "Alday Slay Suspects Awake in 'Disbelief.' " The article described how West Virginia state police used a bloodhound to track the suspects in the mountains of West Virginia.

A front-page article in the May 19 edition of *The Atlanta Journal* contained the headline "Men Held Separately in Atlanta Area Jails." The article began by describing how the suspects had been brought back to Georgia. In the article, FBI agents stated that Coleman confessed to killing Pennsylvania youth Richard Miller, "because I didn't want any witnesses." According to the article, "FBI agent Robert D. Warden of Bluefield, W.Va., described

Coleman as 'a cool customer who displayed no emotion' as he told authorities how he dragged Miller from his car in a deserted area and pumped a bullet into him." The article then described how the most damaging statement came from Dungee. The article noted that "while officials wouldn't disclose the statement's contents, there were indications Dungee named Coleman for the alleged murder of Mrs. Mary Alday." Dungee was quoted as stating, "I didn't kill that woman down there in Alabama. It was Coleman who did that." The article then indicated that Dungee was simply confused about where he had been in describing the crime as taking place in Alabama. The article concluded by noting that the arrest of the four suspects came after the "four wanted men allegedly robbed a store in Slate Creek, Va."

An article in the Sunday May 20 edition of *The Atlanta Journal and Constitution* contained the headline "Alday Death Suspects Move Monday to Donalsonville." The article began by describing how authorities planned to take the four suspects to Seminole County. When asked whether the suspects would be provided sufficient security in the community, William Beardsley, Director of the Georgia Division of Investigation, stated, "I've seen the people in Donalsonville and heard the rumors about mob violence. I don't believe there are those kind of people down there." The article also discussed the disappearance of Pennsylvania youth Richard Miller, and described how petitioner Coleman reportedly told an FBI agent that Miller was killed "because I didn't want any witnesses." At the conclusion of the article, Coleman's quote admitting the murder of Miller was repeated.

In another article which appeared in the May 20 edition of *The Atlanta Journal and Constitution*, the headline read "Aldays, Suspects Contrast. Lived in Worlds Apart." The article simply contrasted the lifestyles of the victims with that of the four suspects. The article described the

victims as "hardworking, nondrinking, and religious." In contrast, the four suspects were described as "drifters, in and out of trouble most of their lives." According to the article, the suspects had "a reputation for breaking the law." The article reminded readers that three of the four suspects were escapees from a Maryland prison. The article concluded by quoting Mrs. Betty Isaacs as stating that "when they [the Isaacs-Coleman brothers] began to grow up they would just stand in front of me and laugh in my face."

An article on page 1A of the May 21 edition of *The Atlanta Journal* was captioned "Suspects Hear Slay Charges." The article began by describing the hearing in which the four suspects were informed of the charges against them. The article also indicated that former Lieutenant Governor Peter Zack Geer had been retained by the Alday family as a special prosecutor in the case. The article described Geer as an "old friend of the Alday family." The article also described local reaction as "decidedly angry toward the suspects." The article concluded by noting that authorities said petitioner Coleman "admitted that he shot and killed Richard W. Miller, 19, of McConnellsburg, Pa."

A front-page article in the May 22 edition of *The Atlanta Constitution* was headlined "Alday Suspects are Charged." The article described petitioner Coleman as a "frail prison escapee with a scraggly mustache and beard" and indicated that he "smirked and smiled repeatedly while asked by Dist. Atty. Ralph Foster if he understood each of the six charges against him." The article also described how former Lieutenant Governor Peter Zack Geer, a longtime friend of the Alday family, had been retained by the family as a special prosecutor in the case. The article noted that immediately after the hearing, petitioner Coleman was taken to Pennsylvania to help in the search for the body of Richard Miller, "whom Coleman has reportedly confessed to murdering." The article also

mentioned some speculation circulating concerning possible revenge against the suspects and noted that one surviving family member stated that any such possibility would "be very much against the family will." The article then discussed special prosecutor Peter Zack Geer and specifically noted that he was retained by the family and would be paid by the family rather than the state for his efforts in acting as special prosecutor in the case. The final paragraph of the article noted that petitioner Coleman "repeatedly smiled or smirked and sometimes seemed amused by the legal proceedings."

An article which appeared in the May 23 edition of *The Atlanta Journal* was headlined "Alday Suspect Fails to Find Slain Victim." The article described how petitioner Coleman had been "unable or unwilling" to locate the body of Pennsylvania youth Richard Miller. According to the article, "[a]uthorities contend Coleman admit[ted] [killing] Miller because 'they didn't want any witnesses.'" In the concluding portion of the article, Sheriff Dan White discounted the possibility of mob violence and stated that "[t]he people of Seminole County want them brought to court and true evidence presented before a jury that will deal with them fairly."

A similar article appeared in the May 23 edition of *The Atlanta Constitution* and noted that officials had had no success in their attempt to find the body of Pennsylvania youth Richard Miller. The article described how petitioner Coleman assisted authorities in looking for the body and noted that Coleman "admitted killing Miller on May 10, a few days after he and two of the other suspects escaped from the Wicomico Prison Farm on Maryland's Eastern Shore." The article again described how Coleman told authorities Miller was killed because they "didn't want any witnesses." Similar articles appeared in the May 23 edition of *The Atlanta Journal* and the May 24 edition of *The Atlanta Constitution.*

A May 24 article in *The Atlanta Constitution* was headlined "Sheriff Sees No Violence Over Slaying of the Aldays." According to the article, Sheriff Dan White "bragged on the lack of violent reaction in his county." Sheriff White stated:

My people don't want violence, and I'm in a position to know. We're all neighbors and we love one another. All we ask for is a fair and impartial trial with a good jury that would give justice. We can get just as fair a jury in Seminole County as any county in the nation. I don't think that—I know it.

According to Sheriff White, the suspects were not being held in the Seminole County Jail because it is "not secure enough—and that's the only reason."

An article in the May 24 edition of *The Atlanta Journal* was headlined "Attorneys Named for Alday Suspects." The article described how the trial judge had named two defense attorneys to represent the accused in the case. The article also described how the search for the body of Pennsylvania youth Richard Miller had been unsuccessful. The article concluded by noting that "[d]espite the fruitless search, authorities are certain Miller was killed by the suspects; they contend Coleman admitted killing the Pennsylvanian."

In the May 25 edition of *The Atlanta Journal,* an article was captioned "Attorneys Regret Alday Case Duty." The article began by noting that the reactions of eight attorneys who had been appointed to represent the defendants ranged from "extreme reluctance" to "dismay." Attorney Willis Conger was quoted as stating "I despise it, I'd rather take a whipping, but the judge appointed me and I have to do my job." Another attorney, Harold Lambert, was quoted as stating, "Based on what I've heard and read, I had reservations whether I could objectively give the defendant the type of defense to which he is entitled. I'm unhappy, I wish this would pass, as they say, but it didn't and I have a legal and ethical obligation to defend this defendant."

The headline for a May 25 article in *The Atlanta Journal* read "Alday Slay Suspect Lawyers Want Out." The article began by describing how two attorneys appointed to represent the suspects have asked to be relieved of their appointments. Attorney Harold Lambert was quoted as stating that the appointment was "the worst thing that's ever happened to me." Attorney Willis Conger stated, "I've done everything I can to get out of it. It's worse than a dose of Colomel [a laxative] but I have to take it. To refuse would be contempt of court." Attorney Lambert was further quoted as stating that if he was not relieved of the appointment, "because of my ethical and legal obligations to the Bar of Georgia, I will do what I have to do."

In an article on page 6B of the May 26 edition of *The Atlanta Constitution,* the headline read "Alday Suspect Lawyer Declines. State Sen. Webb." In the article, State Senator Julian Webb described how he declined to take the case because the state's new death penalty law which he sponsored would likely be challenged and because of his close personal relationship with the victims. Webb was quoted as stating, "I believe I can't in good conscience—personally and professionally—because those people were neighbors and personal friends of mine." The article also told how appointed defense attorney Willis Conger also wished to be relieved of the appointment. Conger was quoted as stating, "I'd very much like to be relieved. I don't know of any lawyer in Georgia who would want this case.... I feel the feeling in Seminole County and this part of Georgia is such that I don't want it."

Headlines for a front-page article in the May 29 edition of *The Atlanta Constitution* read "Alday Suspects. 'Got to be Punished,' Mother Says." In the article, Ms. Betty Isaacs was quoted as stating that "[t]here's no way out, they got to be punished. I'm honest about it. It's hard, but that's the way I feel." The article indicated that petitioner Coleman was serv-

ing a ten-year sentence for armed robbery when he and his half brother Carl Isaacs escaped from a Maryland prison. According to the article, Coleman's armed robbery was the only violent crime for which any of the brothers had been convicted, but all had been "moderately to heavily" involved in illegal activities before their recent escapes.

An article which was somewhat favorable to petitioner Dungee appeared in the May 30 edition of *The Atlanta Constitution*. The article described how Dungee had been regarded as "a safe bet for a minimum security prison." The article generally described his background and quoted a former girlfriend as stating that "[h]e was nice."

In an article which appeared in the May 31 edition of *The Atlanta Constitution*, the headline read "Police Were 15 Minutes Away From Alday Suspects." In the article, a Maryland official described how teletypes were sent out several days before the Georgia slayings warning law enforcement officers about the fugitives. The article described how the official had persuaded a Baltimore newspaper to publish photographs of the four suspects to seek new leads on their whereabouts. The photographs, however, appeared the day after the Donalsonville murders. According to the detective, "By that time, all hell had broken loose. We were trying to alert everyone we could, but you can't alert a whole nation. It could have been a small town anywhere." The article described how "[a]fter their escape, the trio from Poplar Hill joined the younger Isaacs and embarked on a crime spree in suburban Baltimore County that allegedly included gun thefts and auto larcenies." The article also noted that police said that petitioner Coleman admitted killing Pennsylvania youth Richard Miller. When asked whether petitioner Coleman showed any remorse during his search for the Pennsylvania youth's body, a police spokesman replied, "I didn't notice any." The article also indicated that Carl and Billy Isaacs were under investigation for the slaying of a former Baltimore socialite who reportedly gave the Isaacs a lift last November when their car broke down. According to the article, police "theorized the Isaacs may have linked ... [the woman] to their arrest and sought revenge."

In a June 4 article which appeared in *The Atlanta Constitution*, the headline read "Police in Maryland Find Body in Slay Victim Hunt." The article began by reporting that the body of slain youth Richard Miller had been found in Maryland. The article continued, noting that "Wayne Coleman, 26, a fugitive from a Maryland prison farm and one of four men charged with the Alday mass murder, has reportedly confessed to authorities that he and his three companions shot and killed Miller May 10 after commandeering the victim's car near McConnellsburg." The article again quoted Coleman's statement in which he admitted killing Miller because "they didn't want any witnesses." The article concluded by noting that no one has yet been charged in Miller's murder. A similar article appeared in the June 4 edition of *The Atlanta Journal*. That article noted that Miller "was slain with a gunshot wound in the back of the head, the same method used to kill the Georgia victims." The article did not, however, mention Coleman's alleged confession in connection with the discovery of the body.

An article which appeared in the June 4 edition of *The Atlanta Constitution* was captioned "Slaying of Aldays Arouses the Nation." The first sentence in the article recounted how Seminole County Sheriff Dan White had received numerous letters and telephone calls "from angry people who want to see those boys punished." White was also quoted as stating that some of the letters said "[g]ive them the chair." White further noted that most of the people expressed anger over the murders and stated that "[i]t seems like people in Seminole County are not any madder than peo-

ple all over the country." When the possibility of a change of venue was discussed, White stated "[t]he way I feel about it is that the boys are charged with committing crimes in this county so their trials shouldn't be held in another county." According to White, local residents were "just waiting for the court to do its job." The final sentence in the article noted that there had been no direct threats on the suspects' lives.

Headlines from an article in the June 11 edition of *The Atlanta Constitution* read "Maryland in No Hurry for 4 Alday Suspects." In the article, a Maryland prosecutor stated that he would wait until the October grand jury term to seek indictments against the four suspects in connection with the murder of Richard Miller because the men were already in custody in Georgia on murder charges.

A June 13 article in *The Atlanta Journal* was titled "Bobby Hill Joins Defense of Suspect in Alday Case." The article indicated that attorneys Hill and Farrington had been named to replace attorneys Conger and Taylor who had asked to be dropped from the case. Speaking of the Alday murders, attorney Hill stated that the case was "certainly the kind of activity on which the legislature intended to have the death penalty imposed." The article also noted that one of Isaacs' previous attorneys, Conger, cited the proximity of his practice to Donalsonville and his business dealings with the Alday family as justification for his efforts to withdraw from the case.

An article which appeared in the June 14 issue of *The Atlanta Constitution* contained the headline "Alday Case Top Death Law Test." In the first paragraph of the article, attorney Bobby Hill described the Alday case as a "prime test for Georgia's new death penalty law." Hill further stated that "[i]t is the kind of murder case that the legislature obviously intended for the new death penalty to be applied in." Hill also noted that another reason he volunteered to defend Isaacs was because "there was just nobody who was willing to give them the kind of defense they are entitled to under our system of law."

An article which appeared in the June 18 edition of *The Atlanta Constitution* was headlined "Fire Destroys Store Alday Trio Robbed." The article briefly recounted how fire had destroyed a grocery store "where a robbery May 17 led to the capture of four men charged in the slayings of six members of a Georgia family."

An article in the August 8 edition of *The Atlanta Journal* described a committal hearing for three of the four suspects. The article generally contained no prejudicial information, except the article did note that Coleman, Dungee, and Carl Isaacs were escapees from a Maryland prison. This is also true of an article headlined "Grand Jury Next in Alday Case" in the August 9 edition of *The Atlanta Journal* which described how three of the suspects had been bound over for action by the grand jury. A similar article appeared in the August 9 edition of *The Atlanta Constitution* under the headline "3 in Alday Slayings Bound Over," but the article reported that petitioner Coleman "reportedly admitted that he shot [Pennsylvania youth] Miller" as well as noting that he, Dungee, and Carl Isaacs were escapees from a Maryland prison. An October 10 article appearing in *The Atlanta Constitution* entitled "Trial Set Dec. 31 in Alday Case" described how the trial judge had set trial to begin on December 31, 1973, and it also noted that three of the four men indicted by the grand jury were escapees from a Maryland prison. Other articles which reported procedural maneuverings in the case also indicated that three of the four suspects were escapees from a Maryland prison. *See* "Alday Slay Suspect, 16, Refused Juvenile Trial," Atlanta Journal, Oct. 2, 1973; "Trial Shift Denied in Alday Case," Atlanta Journal, Oct. 11, 1973; "Alday Case Trial Order Not Known," Atlanta Journal, Dec. 19, 1973. Another article

appeared in what is apparently the December 23, Sunday edition of *The Atlanta Constitution* and was headlined "Boy, 16, Gets 40 Years in Alday Case." The article began by describing how Billy Isaacs received a 40-year sentence upon entry of his guilty pleas to charges of burglary and armed robbery. According to the article, Billy Isaacs was "expected to be a key witness for the prosecution, according to a reliable source." This article also noted that the three remaining suspects were escapees from a Maryland prison.

An article which appeared in the December 31 edition of *The Atlanta Journal* was headlined "Trial Jury Sought in Alday Slayings." The article began by describing how the process of jury selection had begun in Carl Isaacs' trial. This article noted that the three suspects were arrested following a holdup at a country store in Virginia, that Coleman had admitted shooting Pennsylvania youth Richard Miller, and that all three remaining suspects were escapees from a Maryland prison.

A December 31 article which appeared in *The Atlanta Constitution* was headlined "Alday Jury Selection Press Ban." The article described how the press had been barred from the courtroom during the process of jury selection. The article also described the other precautions taken by the trial judge to keep certain equipment used by the press outside the courtroom. In addition, the article noted that Billy Isaacs had pleaded guilty to burglary and armed robbery and was "expected to testify against his brother and the other defendants."

The January 2 edition of *The Atlanta Constitution* contained a front-page article which was headlined, "Isaacs' Prints Found at Alday Slay Scenes." The article began by noting that Carl Isaacs' fingerprints had been found at the crime scene. The article also noted that petitioner Coleman's fingerprints were also found on the car abandoned in the woods near where Mary Alday's body was found. The article recount-

ed how a West Virginia state trooper testified that he took a wristwatch from Dungee that was identified by a family member as belonging to Mary Alday.

A front-page article in the January 4 edition of *The Atlanta Constitution* described how the jury had returned a guilty verdict in just over an hour and had sentenced defendant Carl Isaacs to death in the electric chair after another 38 minutes of deliberation. The article quoted extensively from closing arguments for prosecution and defense counsel. Another article in the January 4 edition of *The Atlanta Constitution* was headlined "Alday Family Hoped for Death Penalty, Speak Their Feelings." According to the article, one family member remarked "[s]o far so good" when the jury returned a guilty verdict in Carl Isaacs' case. According to the article, the relatives then started a waiting and hoping game—hoping that the seven women and five men on the Seminole County jury would come back with a death penalty for Carl. The article stated that the family "made no attempt to hide their feelings that Carl ought to be put to death for his part in killing six of their blood kin and viciously and repeatedly assaulting 26-year-old Mrs. Mary Alday." One family member was quoted as stating "[w]e would hope the jury would give him [Carl] everything they can. Whatever punishment he gets won't be enough." The article concluded by noting that "[w]hen the jury came back out with its death penalty verdict for Carl, after deliberating only 38 minutes, the wife of one of the Alday victims smiled broadly."

A front-page article in the January 4 edition of *The Atlanta Journal* described how the jury sentenced Carl Isaacs to death in the electric chair. The article noted that Billy Isaacs turned state's evidence in the case and stated that he "described Carl as the ringleader who shot three of the victims personally and laughed when one begged for mercy, and who directed the killings of the other three." The article

also described how relatives of the victims appeared relieved or pleased when the death sentence was announced. The article quoted one family member who asked not to be identified as stating "I've said all the time they [the four suspects] would be found guilty and they'd be sentenced to death."

An article which appeared in the January 7 edition of *The Atlanta Journal* was headlined "Second Alday Jury Sought." The article indicated that the jury selection process was proceeding in George Dungee's case. According to the article, special prosecutor Geer planned to call the same witnesses who testified in the previous week's trial. The article stated that Billy Isaacs "testified that Dungee shot and killed Mary Alday after the young housewife was driven to a wooded clearing some miles from her husband's mobile home where the other family members were murdered."

A headline in the January 8 edition of *The Atlanta Constitution* read "Alday Slay Confession Disputed." The article described how defense attorneys for George Dungee planned to object to an alleged confession made by Dungee to the murder of six members of the Alday family. According to the article, Dungee's attorney "had discussed the possibility of changing Dungee's innocent plea to guilty but he said prosecutor Geer had 'objected' to it." A similar article headlined "Second Trial on in Alday Killings," appeared in the January 8 edition of *The Atlanta Journal.* Another front page article in the January 8 edition of *The Atlanta Journal* was headlined "Testimony Places Dungee at Aldays?" The article reported that a Georgia law enforcement official had testified that fingerprints belonging to Dungee and the three other suspects were found at the crime scene. The article specifically stated that petitioner Coleman's fingerprints were found in the mobile home, in Mary Alday's automobile, and in a car stolen in Pennsylvania which was found near Ms. Alday's body.

The headline for a front-page article in the January 10 *Atlanta Constitution* read "Dungee Given Death in Slaying of Aldays." The article told how defendant George Dungee was found guilty and sentenced to death for his part in the slayings of the Alday family, and described briefly the closing arguments of both parties.

An article on page 8A of the January 10 edition of *The Atlanta Constitution* contained the headline "Plea Against Death Penalty Awes Lawyers." In the article, special prosecutor Geer praised the efforts of defense attorneys for George Dungee to avoid imposition of the death penalty in their closing argument. The article quoted extensively from portions of attorney Sheffield's closing argument.

Of the newspapers read by the residents of Seminole County, the *Bainbridge Post-Searchlight* probably had the least circulation in Seminole County. *See* Deposition of Waldo L. McLeod at 7. Two editorials from the May 17, 1973, edition of the *Bainbridge Post-Searchlight* merit discussion. One editorial, entitled "Corner the Mad Dog," stated:

In the editorial parlance of early American newspapers, it was not uncommon for the editor to suggest that the perpetrator of a heinous crime "should be shot down like a dirty dog."

We never liked that particular phrase, because even the meanest dogs we have ever known would in no way compare with the guilty person or persons who committed the violent, outrageous, atrocious, vicious, and beastly murders of six members of the Alday family in Seminole County sometime last Monday night.

To make such a comparison would be speaking disparagingly of dogs in general, and they are more entitled to consideration than the maniac or maniacs who snuffed out the lives of six human beings, five men and one woman during the course of the evening and in addition, criminally assaulted the woman before she was killed. At least, the record

shows she was criminally assaulted either before or after death.

Fellow citizens, this is not Chicago or Hell's Kitchen. This happened in South Georgia. Even the Mafia would refrain from the magnitude of such a crime.

A sex maniac is running free in our area. A mad dog is on the "loose."

We are staunch believers in law and order, and we believe those who commit capital felonies should be brought before the bar of justice, but this is one case where we hope the guilty will resist arrest, and will be felled where they are cornered.

We must find this criminal or criminals if we have to track them to the four corners of the world. We must bring the ghoul or ghouls to bay and the guilty must be removed from our society just as a dog with rabies is removed. Permanently.

Another editorial in the same edition of the *Bainbridge Post-Searchlight* was entitled, "A Case for Capital Punishment." The editorial stated:

It is remarkable how anyone could be aware of atrocities such as the Alday murders and still contend that capital punishment is too harsh, that it has no place in modern society, or that it is not an effective deterrent to criminals.

Three of the men who are suspected to have murdered the Aldays in an unhurried manner are escapees from a Maryland prison. . . .

.    .    .    .    .

When a man is convicted beyond a reasonable doubt of crimes such as the Alday killings, there is nothing else that can be done for him. It is ridiculous to accept the premise that he can be made to see the error of his ways. As long as he lives, he is a threat to society. If he is imprisoned, he has the opportunity for escape, and even for parole. If he is executed, society has nothing more to fear.

The September, 1973 issue of *Front Page Detective* contained an article entitled "Too Evil to Be Called Animals." The record indicates that at most 300–450 people purchased the September issue of *Front Page Detective.*[12] A sentence in large caption type which appeared on the first page of the article stated that the "beast who gunned down the five God-fearing Alday men and then sexually assaulted and slaughtered pretty Mary Alday were, in the words of a lawman, lower than dogs and they seemed determined to prove it." The article described how the bodies of the five Alday men were found in the trailer and indicated that Mary Alday "had been repeatedly raped and subjected to a hideous ordeal of sexual torture." According to the article, "[e]ven after death, there was reason to believe, the killers had continued to violate the young woman's body." The article also noted that fingerprints found at the scene of the crime, and in an automobile belonging to a missing Pennsylvania youth had been positively identified as those of Coleman, Carl Isaacs, Billy Isaacs, and George Dungee. The article quoted Sheriff Dan White as stating:

There's talk around here of lynching if they're found and brought back. The pitiful, pitiful thing about it is they might never be brought back. Those people will go some other place, commit crimes there and get convicted and never be brought back here for trial.

Of course, if we get them back here, I think they'll be safe—not that I don't

12. The state argues that the actual distribution of the September issue of *Front Page Detective* in Seminole County may have been less than this because residents from other counties may have purchased an unspecified number of the magazines from Seminole County merchants. It seems equally plausible, however, that Seminole County residents may have purchased copies of the magazine from merchants outside Seminole County. Moreover, except for the article's inflammatory title and subtitle, the substance is in most respects cumulative of publicity which clearly saturated the community. In any event, to be conservative, we have discounted the reported circulation and our reliance on the article.

share the community's feelings that they're animals and should be treated as such. Actually, I would hesitate to call them animals. What are you going to compare them with. They're lower than a dog. You take that poor woman. They assaulted her, killed her, left her lying there nude.... Can you name me any animal that doesn't protect its females?

If I had my way about it, I would have me a large oven and I'd pre-cook them several days, just keep them alive and let them punish. And I don't think that would satisfy me.

But it's not my job to prejudge the case. Let me just be the one to catch them. Let's leave it to the court and jury to do the rest.

The article continued, giving the arrest record of each of the four suspects. The article also described how the suspects were arrested after they robbed a grocery store in Slate Creek, Virginia, and attempted to run a police roadblock. The article also indicated that credit cards belonging to Chester Alday and a jacket which belonged to missing Pennsylvania youth Richard Miller were found in the automobile in which the four suspects were traveling. The article also noted that after his arrest, petitioner Coleman allegedly admitted that the four had killed Pennsylvania youth Richard Miller. Coleman was quoted as stating that "[w]e killed him, because we didn't want any witnesses." An attorney appointed to represent one of the four suspects was quoted as stating that "[i]t's the worst thing that's ever happened to me." Another stated, "I've done everything I can to get out of it."

The cover of the November issue of *Detective Files* magazine was captioned "Sex Ghouls in Georgia, 'Six For the Grave ... One For Us.'" The first page of the ac-

companying article contained official mug shots of the four suspects and in large type stated· that "[i]n an effort to satisfy their depraved lust, the foursome didn't shrink from wantonly disposing of anyone who happened to get in their way. As it turned out, six members of a single family were completely obliterated." Devon, *Six for the Grave—One for Us*, Detective Files, Nov. 1973, at 12. The article, describing the four suspects, stated that it "seems likely they came from Hell." *Id.* at 14. According to the article, "they were of that breed which cares nothing for anything except its own brutal needs." *Id.* The article further stated that the four suspects got out of their car at the Alday trailer, "grinning that hard-faced intentness that is known by instinct to all females." *Id.* The article continued and was generally a dramatized account of how the murders might have taken place. Our disposition of the case does not, however, rely upon this particular magazine article at all since, as far as the record indicates, only a few of the magazines were sold because some local merchants removed the magazine from their shelves, deeming it "gross" and "misleading." [13]

Another article captioned "Seminole Sheriff Isn't Letting Feelings Come Before His Job" was distributed to an· uncertain number of individuals in Seminole County who contributed to the Georgia Sheriff's Boys' Ranch, an orphanage. The article consisted primarily of a series of quotes from Seminole County Sheriff Dan White. In the article, he stated:

If I had my way about it, I'd have me a large oven and I'd pre-cook them for several days, just keep them alive and let them punish. And I don't think that would satisfy me.

. . . . .

Whenever I'm protecting them, I'm going to do my job and bring them to court, and I hope they'll get justice.

---

**13.** In evaluating each element of the publicity and the degree of its contribution to the totality thereof, we have endeavored to take into consideration the degree to which the particular element was widely publicized or not. In this vein, we have accorded no weight to the November issue, given its removal from the shelves.

I don't see where they could put up any plea for mercy. The acts of these men are lower than animals.

.    .    .    .    .

If a citizen gets out of hand and starts shooting people up, there's only one way to arrest and that's with a shotgun.

Any man that believes in God believes in capital punishment. I could throw the switch to the electric chair and never lose a minute's sleep.

Virtually the only account of publicity generated through the broadcast media [14] that is in the record consists of a transcript of news broadcasts on the Georgia Network News from May 15, 1973 through January 15, 1974.

Apparently, WAZA in Bainbridge was the only radio station in the Seminole County listening area which carried the Georgia Network News. The record indicates that WAZA broadcast into parts of Seminole County and could be received in Donalsonville and Iron City, the major towns in Seminole County. Surveys or ratings showing the exact listening audience in Seminole County were unavailable because WAZA is located in a small community and does not regularly commission such studies. Deposition of William Roy Simpson at 3–4.

The initial broadcasts on May 15, 1973 identified the victims and contained little information concerning the suspects other than to note that they were "hippy type[s]." On the afternoon of May 15, however, the Georgia Network News reported that authorities were looking for "three whites and a black male that were escapees from Pennsylvania prison, and they had left a car with Pennsylvania tag down there." A subsequent May 15 broadcast stated that authorities "know who they're looking for in connection with the murders." The report stated that:

[T]he escapees came to the Alday home where Mrs. Alday was. They abducted her, then methodically shot the Alday men as they returned to the home from farm work in nearby fields. They then took Mrs. Alday about five miles from the mobile home to a wooded area, where they were believed to have raped and shot her in the head and back. They abandoned the stolen car at the scene and fled in Mrs. Alday's car.

In a May 16 broadcast, the director of the Georgia Division of Investigation, Wil-

---

**14.** The tapes of television broadcasts made during the relevant period were unavailable because the respective television stations did not retain copies of the tapes beyond a period of one to two years. In the state habeas hearings, the editor of *The Albany Herald* testified that "the electronic media played ... [the case] very high." Another reporter with the United Press International testified that as regards UPI wire services, the broadcast wire service stories, designed for radio and television, and the newspaper wire stories concerning the Alday case were "factually the same." Supp. Record on Appeal at 504. Similarly, Mr. Gilbert Kelly, owner of the local radio station, testified that he used the UPI wire reports in his station's coverage of the events. Deposition of Gilbert M. Kelly, at 10. Since no media source that we have examined was entirely nonprejudicial, and all carried approximately the same material, it would be reasonable to assume, although we need not do so, that television stations also broadcast prejudicial information concerning the petitioner. We need not make any assumptions concerning the content of television broadcasts because the record discloses the other sources which clearly saturated the community with highly prejudicial publicity.

We also note that the state is not entirely without fault as regards the unavailability of the television transcripts. At the time of petitioner's state habeas hearing, the state habeas court's subpoena power extended only to within 150 miles of the hearing or trial situs. Oral depositions were also precluded because the petitioner was indigent, and the state habeas court refused to provide the funds necessary for a court reporter to transcribe the depositions. Finally, in federal district court, the state opposed the petitioner's attempt to secure an evidentiary hearing, and this court was forced to remand the case to the district court to allow the petitioner an opportunity to make an evidentiary showing with respect to pretrial publicity. *Coleman v. Zant,* 708 F.2d 541, 548 (11th Cir.1983). Thus, the ensuing delay cannot be deemed to be entirely of the petitioner's own making. In this regard, we note that the state makes no argument based on any alleged delay by petitioner.

liam Beardsley, stated that he felt that "we have some very valid prints." In a subsequent May 16 broadcast, Beardsley indicated that fingerprints were found "in the trailer and some on the automobile that was abandoned, where the woman's body was found." Each of the May 16 broadcasts also theorized that the rape of Mrs. Mary Alday was the only motive in the case. The May 16 broadcast noted that authorities were still lacking "the main lead, where the three Maryland prison escapees went after they reportedly shot and killed the six Aldays." The May 16 broadcast also theorized that the four suspects might be connected with some murders in Florida.

The first broadcast on the Georgia News Network of May 17 stated that "fingerprints which state agents found virtually all over the place at the crime scene outside Donalsonville and in an abandoned car have helped police firmly identify the suspects as three Maryland prison escapees and the brother of one of them." Subsequent broadcasts on May 17 described how Ms. Mary Alday's car was found in Livingston, Alabama. Virtually all of the May 17 broadcasts identified the suspects as Maryland prison escapees.

The initial broadcast on May 18 described how George Dungee had been taken into custody in West Virginia and that authorities were continuing their search for the other three suspects. The report noted that the "four are believed to be the killers of six members of a Donalsonville, Georgia, family last Monday night." A subsequent May 18 broadcast described how police in West Virginia captured the three remaining suspects with bloodhounds. In another May 18 broadcast, Sheriff Dan White reportedly stated that "he thinks the people in his county are so incensed at the shootings that there may be a try at mob violence if the four suspects are brought to the area." Another May 18 broadcast reported that "the McDowell County, West Virginia, Sheriff said today that a fugitive

taken into custody yesterday, 35 year old George Dungee, confessed to complicity in the South Georgia incident, but charged that 26 year old Wayne Coleman, another of the fugitives, shot the six Aldays." Sheriff White was again reported as having said that "there is a possibility that if the suspects were brought to Donalsonville for jailing prior to trial, that the enraged population, at least some members of it, would attempt mob violence, meaning a lynching." In a broadcast during the afternoon of May 18, West Virginia Sheriff Archie Day was quoted as stating that "[t]hey [the suspects] have—the colored boy did confess to me that they were the ones that killed these people down there." That report also noted that Seminole County officials feared mob violence if the suspects were brought back there to be jailed. In a subsequent broadcast on the afternoon of May 18, Sheriff White was quoted as stating:

> It's a relief to us that we've got these men and we'll bring them to justice. We have a—we have a fair courts [sic] here, good a' courts as there is in the nation, and our people here believe in God and they believe in law and order. You got to believe in God if you believe in law and order. You got to believe in cap—if you believe in God, you got to believe in capital punishment.

Another broadcast during the afternoon of May 18 repeated the quotation in which Sheriff Archie Day described how George Dungee confessed. The report also repeated Sheriff White's "God, law, and order" quotation noted above, which was broadcast earlier in the day.

The initial broadcast on May 21 described how the four suspects were being taken to Donalsonville for a preliminary hearing. The broadcasts stated that "[p]olice and state troopers in the southwest Georgia town of Donalsonville will be out in force today to protect the four from potential mob action, which the sheriff, Dan White, says is a real potential." In the same

broadcast, Everett Alday appealed to residents to keep their heads because "enough folks have been hurt already." In a subsequent broadcast on the morning of May 21, the Georgia Network reported that "purchases of handguns in the small Southwest town of Donalsonville has [sic] skyrocketed." Another May 21 broadcast described how William Isaacs "reportedly laughed and smirked during the court hearing in Donalsonville." The report also indicated that immediately following the preliminary hearing, one of the prisoners would be taken to Pennsylvania to assist in the search for the body of Pennsylvania youth Richard Miller. When Georgia Division of Investigation Director William Beardsley was asked about the possibility of mob action, he stated, "Oh, no, no, uh-uh. These are very sophisticated people down here. We didn't anticipate anything, and I'm just sure there won't be anything." A broadcast on the evening of May 21 described the suspects' preliminary hearing and again noted that William Isaacs "reportedly laughed and smirked during the court hearing." In the broadcast, a police officer was quoted as describing the young Isaacs as "the meanest bastard of them all." This report also indicated that "one of the four accused killers will be going back to Pennsylvania, where he reportedly stole a car and killed the driver of that car, Wayne Miller."

On the morning of May 22, the Georgia Network reported that "[a]s the sun comes up on McConnellsburg, Pennsylvania, today, police will remove a 26-year-old Alday murder suspect, Wayne Coleman, from a jail cell to look for a dead man. Coleman reportedly told Georgia authorities he killed the driver of a car he and three others stole before coming to Georgia last week." In numerous other broadcasts on May 22, Georgia Division of Investigation Director William Beardsley indicated that evidence against the four suspects was not yet complete but nonetheless expressed his confidence that the evidence would be sufficient when the four came to trial. Another May 22 broadcast noted that former Lieutenant Governor Peter Zack Geer had been retained as a special prosecutor in the case by the Alday family.

In a May 23 broadcast, the Georgia Network reported that Pennsylvania police were still looking for the body of a Pennsylvania youth. The report stated that "[p]olice say they believe the original four murder suspects from Maryland stole the car after Coleman killed the driver, and used the car as their transportation to Georgia before the Alday murders of Donalsonville." A subsequent broadcast on May 23 noted that Pennsylvania authorities were "looking for the body of a man Coleman allegedly told police he killed." Subsequent broadcasts on May 23 also focused on petitioner Coleman's assistance in the search for the body of the Pennsylvania youth.

On May 25, the Georgia Network News focused on several attorneys' reluctance to act as defense attorneys for the suspects. In one May 25 broadcast, state Senator Julian Webb of Donalsonville was quoted as stating:

> The Alday families, both Ned and Aubrey, were friends of mine for many years. Ned Alday's farm is just north of my farm, and Aubrey Alday's farm is just south of mine. And secondly, I sponsored the death penalty law which is now on the statute books, and apparently these crimes fall squarely within the provisions of that statute.

According to the report, Senator Webb deemed the appointment a "conflict of interest," and he stated that the four suspects could get fair trials in Seminole County.

The next broadcast in the case apparently came on June 4 when the Georgia Network News reported that Maryland police had found the body of Richard Miller. According to the report, "[o]ne of the alleged Alday murderers, Wayne Coleman, reportedly told police that he and his three companions shot and killed Miller after stealing

his car. Authorities speculate that the four killed Miller because they did not want any witnesses."

Until December, when the actual trial began, reports on the Georgia Network were primarily factual and contained no prejudicial information although reports on June 20 and on September 4 identified three of the four suspects as prison escapees from Maryland. Otherwise, the broadcasts simply recounted procedural events in the case.

On December 24, however, the Georgia Network reported that Billy Isaacs "is expected to be a star witness for the prosecution against his brothers and a third companion when their murder trials begin in Donalsonville December 31st." The report continued noting that "Isaacs may well be the only eyewitness to the crime available to the prosecution. He has reportedly issued a statement to lawmen describing the slayings of Ned Alday, his three sons, Jimmy, Jerry and Chester, his brother Aubrey, and daughter-in-law, Mary Campbell Alday." Subsequent reports on December 24 repeated this information.

Broadcasts on December 28 also noted that Billy Isaacs "is believed to have turned State's evidence, and may provide eyewitness testimony to the slayings."

Broadcasts on December 31 on the Georgia Network noted that jury selection in Carl Isaacs' case was proceeding, and many of the broadcasts noted that one of the suspects who had already pleaded guilty was expected to turn state's evidence in the case against Carl Isaacs.

January 1 broadcasts on the Georgia Network indicated that special prosecutor Peter Zack Geer promised to produce an eyewitness to the killings and also noted that a local resident had identified Carl Isaacs as the driver of an automobile seen leaving the Alday trailer on the day of the murders in his testimony.

A January 2 broadcast on the Georgia Network described Billy Isaacs' testimony as follows:

A teenager has testified at Donalsonville that his brother and two other men wiped out a farming family of six in an isolated trailer last May, killing five men and one woman, one by one. But 16 year old Billy Isaacs, the State's star witness, denied that he killed or assaulted anyone. He testified against his own brother, 19 year old Carl Isaacs, the first of the three defendants to be tried for the murders of six members of the Ned Alday family. Young Isaacs said that his brother gave the orders for the killings as the Alday men showed up during their burglary of the trailer.

On the evening of January 2, another Georgia Network News broadcast further described Billy Isaacs' testimony as follows:

With his brother sitting directly in front of him, Billy spelled out in a flat, unemotional voice the details of that day of horror last May. Billy said that over the course of an hour, Carl Isaacs took three of the Alday men and one at a time shot them in the head. Billy also said two other Alday men and Mary Alday were similarly murdered by the two other suspects in the case. Those other suspects will be tried separately.

A broadcast on the morning of January 3 repeated this information and noted that closing arguments in the case were expected that morning. Another broadcast on the morning of January 3, describing Billy Isaacs' testimony, stated that "Billy told how over an hour, Carl methodically shot three Alday men in the head, laughing when one begged for mercy." Subsequent broadcasts on January 3 described how the jury brought back a guilty verdict against Carl Isaacs.

On the morning of January 4, the Georgia Network reported that Carl Isaacs had been sentenced to death the previous day after being found guilty on six counts of murder. The report stated that "Isaacs is said to have yawned while the prosecutor was asking for the death penalty." Subsequent reports on January 4 noted the

guilty verdict and death sentence announced in Carl Isaacs' case and indicated that George Dungee was set to go on trial the following Monday.

On January 7, numerous reports on the Georgia Network News indicated that jury selection was proceeding in George Dungee's case and also reminded listeners that Carl Isaacs had been found guilty and sentenced to death the previous week.

In a morning broadcast on January 8, the Georgia Network News reported that defense attorneys for George Dungee planned to object to a "legal confession" that special prosecutor Peter Zack Geer said he hoped to introduce at the trial. Subsequent broadcasts on the morning of January 8 repeated the information with respect to the alleged confession of Dungee, and another January 8 broadcast stated that "[y]oung Billy Isaacs is expected to take the stand later today to describe Dungee's part in the killing of six members of the Alday family last May." In the afternoon of January 8, the Georgia Network News reported that a Georgia law enforcement official testified that George Dungee's fingerprints were found on a beer can outside of the mobile home where the crime occurred. The official was also reported as having testified that four prints were found inside the mobile home and that fingerprints were also found on the 1970 Chevrolet which was found in Livingston, Alabama, that belonged to Mary Alday. Subsequent reports on the afternoon of January 8 reiterated the fact that "fingerprints at the scene of the Alday murders in Donalsonville put George Dungee at the scene."

Broadcasts on the morning of January 9 described how Billy Isaacs testified that George Dungee "pulled the trigger on the gun which took the life of Mrs. Mary Alday." The reports also indicated that Carl Isaacs had previously been found guilty and sentenced to death by a Seminole County jury. On the afternoon of January 9, the Georgia Network News reported

that George Dungee was the second defendant in the case to be convicted and receive the death penalty. Similarly, reports on January 10 indicated that Dungee was the second of the defendants to receive the death penalty and that the trial of the third and final defendant, Wayne Coleman, was scheduled to begin the following Monday.

Testimony developed in the evidentiary hearings on remand in the district court clearly establishes that word-of-mouth communication constituted one of the major means in which Seminole County residents received their news. Mr. Alto Lee, an attorney who assisted in the prosecution of the case at trial, testified that as regards the Alday murders, "because of the number of people involved in this and the attention that it received from elsewhere, I don't know exactly how I could categorize it, sir. Things were known in Seminole County. It's a small, rural county. It's not a large county. And when something happened, it was pretty well known down there, be it the Alday case or be it other cases, other matters like that. Yes, sir, the word got around." 4th Supp. Record on Appeal, vol. 2 at 62.

Undoubtedly, the most colorful description of word-of-mouth communication in Seminole County came from Ms. Thelma V. Harrington, a lifetime resident of Seminole County and a juror in the Dungee case. According to Ms. Harrington, news of the murders "scattered just like fire in broom sage." *Id.* at 176. As regards the electronic media, Ms. Harrington testified that after the murders occurred, "everybody listened more than usual." *Id.* at 177. When asked whether local residents talked about the crimes a great deal, Ms. Harrington stated, "My Lord. They'd have had to have lockjaw not to because that was the topic or the subject around a little town like Donalsonville there, and everybody was so excited and upset over it." *Id.* at 186. Ms. Harrington described the way word was transmitted through the community as

"just like chaff in the wind." *Id.* at 195. She stated, "[r]adio, television, mouth-to-mouth and friend-to-friend. Everybody was talking about it." *Id.*

One of the most disturbing portions of Ms. Harrington's testimony, however, is her description of the community attitude existing at the time of trial. The colloquy reveals the following:

Q. Okay. And everybody was upset about it?

A. Why, sure.

Q. What do you mean by that?

A. Well, they were nice people, religious people, and good citizens, and they hated to see people like that did kill them do it.

THE COURT: In other words, the people in the county were not in favor of it?

THE WITNESS: That's what I'm trying to say. That's exactly. Appreciate your straightening it out for me.

BY MR. BRIGHT: Q. Right.

A. No, nobody condoned it at all.

Q. And did people indicate what they thought ought to be done about it?

A. Mighty right they did.

Q. What did they say?

A. Fry'em, electrocute 'em.

Q. What else?

A. That's about all I heard, and that's what should be done for 'em.

Q. But that was the community sentiment, fry 'em or electrocute 'em?

A. Everybody felt that, yes.

Q. Everybody?

A. Yes.

*Id.* at 187–88.

Ms. Harrington's testimony on cross-examination by the state's attorney also reveals the following:

Q. Ms. Harrington, isn't it true that members of the Seminole County and Donalsonville area that you talked to said the defendants should be electrocuted or fried, as you've said, if they were the ones that had committed the crimes?

A. Everybody had that sentiment, I think.

Q. Isn't that with the ones that had committed it though, Ms. Harrington?

A. Yes.

Q. They should not be punished if they had not done the crime though, should they?

A. Well, everybody knew they did it though.

Q. How did they know that, Ms. Harrington?

A. All the circumstantial evidence.

*Id.* at 197.

Another local resident, Mr. Watson Lee, testified that the Alday murders were the biggest news story he could remember during the fifty years he had lived in Donalsonville. *Id.* at 201. Mr. Lee also described the victims' family as "one of the most prominent families in Seminole County." *Id.* at 202. When asked whether he was aware of anyone who had not heard about the cases by the time they came to trial, Mr. Lee stated, "No, sir, not that I know of because it's a small place and news gets around, you know. And people like to keep up on things like that down there." *Id.* at 203. Although indicating he would be afraid to say what people in the community thought ought to happen to the guilty parties, when pressed, Mr. Lee stated: "Well, I mean most of them that I heard thought it was a terrible thing and that they ought to get a severe penalty out of it." And when asked what he meant by "severe penalty," he continued: "Well, I don't know. They didn't say executed. You know how a small town is. But that's probably what they had in mind." *Id.* at 204.

Mr. Bobby Nichols, the clerk of the trial court in which the defendants were convicted, stated that he knew of no other trial in Seminole County during the period of time in which he had been acting as clerk of the court which received any more publicity than this trial. *Id.* at 224. Mr. Nichols

also testified that the only news event that received as much publicity at the outset was a hotel fire that had occurred several years earlier. *Id.* at 225. Mr. Nichols also testified that before Coleman's trial began, he formed an opinion that the suspect was guilty. *Id.* at 230. Mr. Nichols also testified that after Carl Isaacs' trial was complete, he decided that if the other defendants were subsequently convicted, they should also receive the death penalty. *Id.* at 231.[15]

Mr. Bill Montgomery, a reporter with *The Atlanta Journal* who was in Seminole County shortly after the crimes were committed and interviewed local residents to get a sense of the reaction of the community, testified that "from personal interviews that I had with people and hearing conversation on the streets, from interviews, they wanted the defendants caught and they wanted them executed." *Id.*, vol. 3 at 46–47. Mr. Montgomery testified that he never heard any different attitude expressed by anyone in the community and stated that the "general attitude to my recollection all along was that if they were guilty they should be executed." *Id.* at 48. When asked whether he met anyone who had a contrary opinion, Mr. Montgomery stated "I can't recall anybody—the people

that I talked to were—the people that I talked to seemed to feel that these were the right people, that these defendants had committed the murders and that they wanted them executed, the people that I talked to." *Id.* at 69.[16]

Dave Harrison was a reporter with *The Albany Herald* and covered a five-county area, including Seminole County from 1972 to 1977. Mr. Harrison described Seminole County as a "very tight knit community," *id.*, vol. 6 at 470, in which "everybody knows everybody. Everybody is almost kin to everybody else in the county. It's that type community. Everybody considers everybody else neighbors." *Id.* at 471. Although *The Albany Herald* was a daily paper, Mr. Harrison felt that word-of-mouth communication in the community was such that the majority of the people in the county knew about the crime before *The Albany Herald* got to the county. *Id.* at 477. Mr. Harrison also stated that the "talk" that he heard with respect to the perpetrators of the Alday murders was that the "people who killed the Alday family should be given the same type justice that the Alday family was given." *Id.* at 479. In Mr. Harrison's opinion, the Alday murders were "the biggest news story that's ever happened in that county." *Id.*

---

15. Although this is a significant concession from a witness who was even more "unfriendly" to petitioners than other witnesses (most of whom were understandably unfriendly), since Mr. Nichols, as clerk, actually sat through the earlier trials, his tendency to prejudge naturally would have been greater than that of the general public. On the more relevant issue of the opinions of others in the community that he might have heard, Mr. Nichols was more equivocal, although he did "assume that they felt like the punishment was just," and he did say that community sentiment was that the guilty parties should be punished and that the people wanted "justice to be done." *Id.* at 233. Moreover, earlier in his testimony Mr. Nichols had refused to affirm that the news accounts before trial had given the impression that Coleman, et al., were guilty; he would acknowledge only the impression that they were "accused" and that they were "good suspects." *Id.* at 227–28. Mr. Nichols' testimony is sufficiently equivocal that Coleman cannot place much reliance on it.

16. Mr. Montgomery also testified that he did some investigative work in Seminole County in connection with a story written five years after the crimes occurred. Mr. Montgomery interviewed Mr. Bud Alday in connection with his story. According to Mr. Montgomery, Mr. Alday said "that some individuals—he didn't say who they were, as I recall wouldn't say who they were—but some individuals came to him that week after the defendants had been captured in West Virginia and had told him something to the effect that, you know, you give the word and this quote—I remember the direct quote—said something, if you give the word, we'll take those boys when they're brought back for arraignment. And he said that 'I told them not to, I talked myself'—as I recall, he said something like, 'I talked myself blue in the face' and said that 'society, the courts had to be given a chance.'" 4th Supp. Record on Appeal, vol. 3 at 109–10. We place no reliance on this post-conviction revelation.

at 482. Mr. Harrison indicated that neither the publicity that he saw nor the conversations that he heard contained any information that was favorable to the suspects in any way. *Id.* at 483. In describing the hostility the community felt towards the suspects, Mr. Harrison stated that "people were just very angry about it, and they wanted the people who had done this to pay for it. They wanted revenge." *Id.* at 484. Mr. Harrison also testified that there was a "general community opinion" that whoever was guilty of the Alday murders should receive the death sentence. *Id.* at 486. Mr. Harrison did testify, however, that he heard some rumors in the community that individuals who were associated with a man previously found guilty of a robbery in the area might have been responsible for the Alday murders. Mr. Harrison also testified that he heard rumors to the effect that individuals in a religious organization which was located in Seminole County and which consisted primarily of blacks from New York and New Jersey might have been involved in the Alday murders. *Id.* at 498–99. Mr. Harrison also agreed that some members of the community spoke out in the press and said they wanted to make sure the defendants got a fair trial "because they didn't want them to get off." *Id.* at 499.

Mr. Bill Cotterell, a reporter for United Press International, was also in Seminole County shortly after the crimes were committed and again during the trials. In describing the types of media available to the residents of Seminole County, Mr. Cotterell stated, "I'd say radio, television, the daily newspapers. The time I spent there I would also feel that just word-of-mouth in such a small place. Word got around fairly fast and not always accurately, but major events were common knowledge very quickly throughout the community." *Id.* at 510. In preparing his news stories, Mr. Cotterell stated that he spoke with numerous residents of Seminole County. *Id.* According to Mr. Cotterell, the general opinion in the community seemed to be that the

four suspects were guilty, and he never heard anyone express a contrary opinion. *Id.* at 514. Although Mr. Cotterell did not remember asking the citizenry's opinion as to the appropriate punishment, he testified that "usually as a continuum in a sentence people would say people like that ought to be executed." *Id.* Although Mr. Cotterell testified that he never heard anybody directly threaten the lives of the four suspects, he stated that he "heard frequent expressions of an attitude that 'isn't it too bad that when they get these guys and when they're convicted it's going to take forever for justice to be done, and wouldn't it be better if we could just do it on the spot.'" *Id.* at 515.

On the Saturday following the murders, Mr. Cotterell stated that he was in Donalsonville for a scheduled arraignment which never took place. Mr. Cotterell described how a crowd had gathered in downtown Donalsonville and stated that "there was a persistent opinion expressed that if the judge just released them on recognizance and bound it over for trial, that justice would then be swiftly done within the community." *Id.* at 516. Mr. Cotterell further testified that when he returned to Donalsonville for the trial of Carl Isaacs there was no change in attitude and that he "heard no one express any doubt that they were guilty and that they deserved to be executed." *Id.* at 522. On cross-examination, Mr. Cotterell agreed that the community wanted the defendants to receive a fair trial. *Id.* at 530.

Gil Kelley, owner of the local radio station in Donalsonville, gave what is probably the most favorable testimony to the state. As the events surrounding the Alday murders were unfolding, Mr. Kelley testified that "the biggest job that my station had, I had, was keeping the true identity of the people of Seminole County. Seminole County is not a South Georgia, back-woods, red-necked community. It's a cultured community. It's a refined community." Deposition of Gilbert M. Kelley at 14. Mr.

Kelley stated that the Alday murders were not the biggest news story that his radio station had ever broadcast nor was it one of the most important news stories. *Id.* at 16. Nonetheless, Mr. Kelley admitted that the common feeling among residents in the county was that most probably, the authorities had arrested the proper parties in the case, and he also stated that he was not personally aware of any sentiment in the community which desired an acquittal in the case. *Id.* at 21. On cross-examination, however, he responded affirmatively to a question as to whether the defendants could get a fair trial at that time in Seminole County, *id.* at 50, and stated that the trial was not a foregone conclusion. *Id.* at 51.

Waldo McLeod, editor of the *Donalsonville News*, agreed—"[i]n all honesty, I think affirmative"—that the general feeling in the community was "that the persons who had been charged with this crime were the ones who had committed it," and "that the law enforcement officials had arrested the right people." Deposition of Waldo L. McLeod at 27. Moreover, Mr. McLeod agreed that the Alday murders were really the biggest news story that came out of Seminole County. *Id.* at 31. Later, Mr. McLeod stated that he believed they had a fair trial. *Id.* at 33.

### III. APPLICATION OF THE PRESUMED PREJUDICE STANDARD

■ At the outset, we emphasize the fact that the presumptive prejudice standard recognized in *Rideau* is only "rarely" applicable, *Nebraska Press Ass'n v.*

*Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976), and is reserved for an "extreme situation." *Mayola v. State of Alabama,* 623 F.2d 992 (5th Cir. 1980). In short, the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.

In *Patton v. Yount,* 467 U.S. 1025, —, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847, 857 (1984), the Supreme Court held that where the partiality of an individual juror is challenged, the statutory presumption of correctness due a state court's factual findings under 28 U.S.C. § 2254(d) is fully applicable. With respect to the actual prejudice issue—*i.e.,* whether prejudice has invaded the actual panel of twelve jurors—the *Patton v. Yount* majority questioned the conclusion that it was a mixed question of fact and law. However, without definitively resolving the issue, the Court applied the *Irvin* "manifest error" standard, intimating that there may be "little practical difference between the Irvin 'manifest error' standard and the 'fairly supported by the record' standard of the amended habeas statute." *Id.* at — n. 7, 104 S.Ct. at 2889 n. 7, 81 L.Ed.2d at 854 n. 7. With respect to the somewhat different presumed prejudice inquiry under *Rideau,* we need not decide whether presumed prejudice is a mixed question of fact and law [17] or a pure question of fact, because applying any of the relevant legal standards, be it "manifest error," "fairly supported by the record,"[18] "clearly erroneous," or independent review of a mixed question of fact and law under the extremely high *Rideau*

---

17. The law of this circuit has treated the presumed prejudice issue as a mixed question of fact and law. *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980); *United States v. Williams,* 523 F.2d 1203, 1208 (5th Cir.1975).

18. Although beside the point in light of our analysis, it is clear from the previous appeal in this case, *Coleman v. Zant,* 708 F.2d 541 (11th

Cir.1983), that the "fairly supported by the record" standard would be inapplicable. Because material facts were not adequately developed at the state court hearing, and because petitioner was unable to adduce live testimony due to state procedural limitations and lack of funds, there is little doubt that the state court hearing was not full and fair. *Id.*

standard, we conclude that Coleman has met the standard.[19]

■ Applying the extremely high standard of review, our review of the record in the instant case leads to the inescapable conclusion that petitioner Coleman was denied his right to a fair trial before an impartial jury. Indeed, this case is a close case only because of the extremely high standard that must be met. If there were no constitutional right to a change in venue in the instant case, then one can conceive of virtually no case in which a change of venue would be a constitutional necessity.

In determining whether petitioner Coleman's jury met the constitutional standard of "a panel of impartial 'indifferent' jurors," *Irvin v. Dowd,* 366 U.S. at 722, 81 S.Ct. at 1642, we must examine the totality of the circumstances surrounding the petitioner's trial. *See Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). In examining the totality of the circumstances surrounding petitioner Coleman's trial, we emphasize the fact that no single factor is dispositive. Instead, we have weighed each element of the prejudicial publicity, taking into consideration the pervasiveness of the circulation thereof, and how that publicity contributed to the totality of the circumstances. Although residents of Seminole County may have been exposed to more than one of the several media, i.e., newspaper, broadcast and word-of-mouth, our evaluation has recognized the obvious fact that no one person would have read, for example, all of the newspapers summarized in this opinion, or all of the publicity in any single newspaper. Thus, we have been careful to discount accordingly the overwhelming cumulative weight of the description in Part II of this opinion.

After reviewing the record in the instant case, the manifest picture that emerges is a community that was deeply prejudiced as to both guilt and sentence. As soon as petitioner Coleman and his co-indictees were identified as suspects in the case, law enforcement officials announced that circumstantial evidence against the suspects was "overpowering," and that "there's no point in looking for anybody else." The press revealed that the suspects' fingerprints had been found at the scene of the crime. The fact that petitioner Coleman and his co-indictees were escapees from a Maryland prison was reported along with their prior criminal records, including the crime spree along the Eastern Seaboard of which the instant murders were a part. Petitioner Coleman was rarely identified as a suspect in the case without the article noting that he had confessed to the murder of Pennsylvania youth Richard Miller. All of the foregoing was widely reported in all of the newspapers serving Seminole County, and in what the record discloses of the broadcast media. It was repeated time and again. The details of the testimony of Coleman's own half-brother, Billy Isaacs', describing explicitly the horrible manner in which Coleman and the others murdered the six Alday family members, were widely and repeatedly reported in Seminole County immediately prior to Coleman's trial. In short, there was an overwhelming showing in the press of petitioner Coleman's guilt before his trial ever began.

In addition, there was publicity that was either calculated to provoke hostility or reflective of an atmosphere of hostility; including, *inter alia,* the "precook" and other egregious remarks by the county's chief law enforcement officer, Sheriff White; the newspaper description of the defendants as smirking and other characterizations of remorselessness and other derogatory characterizations; the remarks of the defendants' own mother suggesting that mercy was inappropriate; the efforts and statements of numerous attorneys to

---

**19.** In view of our disposition of the case, we need not decide whether the state should be deemed to have waived any argument that the issue is one of pure fact, because of the state's concession in *its* brief that the issue is a mixed question of fact and law. *See* Supplemental Brief filed June 24, 1985, at 17.

avoid appointment, both reflecting their assessment of the community atmosphere and aggravating same; and the direct testimony of several residents and newsmen, whose job included assessment of the community atmosphere, to the effect that the community had prejudged the case.

Further aggravating the atmosphere was the evidence that the community was of the opinion that death was the only appropriate penalty for those found guilty of the Alday murders. The fact that the family wanted the death penalty pervaded the community. This was particularly prejudicial because Seminole County is a small community in which the victims' family was well known and respected, and the voir dire revealed that several jurors knew the family. One knew five of the six victims personally and attended their funeral. Another had known the victims for eight years and had worked with two of them. A third went to the trailer to pay his respects to the family two days after the victims' deaths. It was common knowledge in the community that special prosecutor Geer was retained by the surviving family members to prosecute the case. This fact coupled with his appeal to the jury to impose death conveyed the unmistakable implication to the jury that the family hoped that the defendants would receive the death penalty. Moreover, shortly before petitioner Coleman's trial it was widely reported that family members were pleased with the death sentence returned in Carl Isaacs' case. Significantly, the community's ranking law enforcement officer made widely reported and outrageous statements as to the need for vengeance, retribution, and capital punishment, all in the name of "justice."[20] Finally, editorials called for the death penalty, and reports of comments from attorneys and other news articles repeatedly suggested the appropriateness of the death penalty.

The clear picture that emerges from the publicity itself—that the community was predisposed as to both guilt and sentence—is borne out by the testimony of several local residents and by the testimony of several journalists whose jobs included reporting the atmosphere of the community at the time. *See supra* 1532–1536. As Ms. Harrington testified: everyone knew they were guilty and everyone knew they should be electrocuted.

Under such circumstances, it is inconceivable to think that petitioner Coleman received an impartial assessment of his guilt or innocence on the basis of the evidence, and the detached weighing of aggravating and mitigating circumstances which the Georgia death penalty system contemplates.[21]

The description of the publicity set out earlier in this opinion leaves no doubt but that this small community was overwhelmed and saturated with prejudicial and inflammatory publicity.

The showing made by petitioner Coleman in the instant case equals that made in *Rideau.* As summarized above, the press saturated the community with overwhelming evidence of Coleman's guilt. The explicit details of the inculpatory and eyewitness testimony of Coleman's own half-brother, Billy, together with the other publicity in this case, approaches the preju-

---

**20.** The state suggests there is contrary evidence, noting that some individuals made appeals for a fair trial for the four suspects. However, these appeals are subject to question. Almost all of the appeals for a fair trial were made in a context of an effort to calm down the community to avoid the fear of mob violence, or in a context of a desire that the trials be held in Seminole County and not transferred elsewhere, or in a context of following all the procedural steps, thus equating a fair trial with one in which the procedural steps were followed even if the outcome were a foregone conclusion. *See* editorial, *Donalsonville News,* May 2, 1973, *supra* at 11.

**21.** Because of our disposition of the case, we need not address the argument that the district court on remand erred in excluding the proffer of expert testimony by Dr. Nobles analyzing the pretrial publicity.

dicial impact of the televised confession in *Rideau.* In some respects, the instant conviction is even more vulnerable than *Rideau.* Many of the widely publicized facts were not admissible at Coleman's trial,[22] *e.g.,* his confession to the murder of the Pennsylvania youth, the fact that he was an escaped convict and his participation in a crime spree along the Eastern Seaboard. Also there was strong additional evidence here, but not in *Rideau,* that the community was inflamed, *e.g.,* the sheriff's egregious remarks, the direct testimony of residents and newsmen, and the other evidence summarized above. In addition, Seminole County's population of 7,000 was much smaller than the Calcasieu Parish population of 150,000, the significance of which is magnified by the evidence of the community's and the jury's friendship and sympathy for the victims and their family. Finally, the instant case is stronger than *Rideau* in that there was no evidence of prejudice as to sentence in *Rideau,* whereas there was very strong evidence in this case, as summarized above.[23]

We conclude that petitioner has adduced evidence of inflammatory and prejudicial pretrial publicity that so pervaded the community as to render virtually impossible a fair trial before an impartial jury. Just as it is inconceivable that Rideau could have received an impartial assessment of his guilt in the community in which his televised confession was broadcast, it is inconceivable that petitioner Coleman could have received either an impartial assessment of his guilt or innocence or a detached weighing of aggravating and mitigating circumstances in Seminole County. The district court's finding to the contrary is clearly erroneous, and any finding to the contrary would be manifest error.

The state argues that there was no "nexus" between the pretrial publicity and the guilty verdict and death sentence returned by the jury. In *Rideau,* however, the Supreme Court specifically rejected the view that a habeas petitioner must establish a "substantial nexus" between the pretrial publicity and the petitioner's trial. *See* 373 U.S. at 729, 83 S.Ct. at 1420 (Clark, J., dissenting). The reason for such a rule is clear: when the extremely high showing required by *Rideau* is made, prejudice is manifest and thus is presumed.

The state also repeatedly argues that there was overwhelming evidence [24] of the petitioner's guilt and also argues that the

---

**22.** Although the defendant's televised confession in *Rideau* was not admitted in evidence at trial, oral and written confessions made on the night of his arrest were admitted in evidence. *See Rideau,* 373 U.S. at 730, 83 S.Ct. at 1421 (Clark, J., dissenting).

**23.** In *Murphy v. Florida,* 421 U.S. 794, 800 n. 4, 95 S.Ct. 2031, 2036 n. 4, 44 L.Ed.2d 589 (1975), the Supreme Court distinguished "mere familiarity with the petitioner or his past" from an "actual predisposition against him." The Court also noted the distinction between "largely factual publicity" and "that which is invidious or inflammatory." In *Murphy,* the Supreme Court found that the general community (metropolitan Dade County) atmosphere was not inflamed and that the publicity, which itself was largely factual in nature, had occurred almost entirely at least seven months before trial. By contrast, the instant record reveals a small rural county barraged with prejudicial publicity continuing up to the time of the trial, as well as other evidence, all as described in the text, *supra,* inescapably reflecting an atmosphere of predisposition as to the guilt and sentence.

The actual trial in this case was conducted by Judge Geer with decorum and dignity. Thus, there was no "circus atmosphere" which might have aggravated the atmosphere generated by the pretrial publicity, as in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). To the contrary, the trial atmosphere here was a positive contribution to the totality of the circumstances.

**24.** The question could also be posed as one of whether harmless error analysis should apply to the petitioner's change of venue claim. In its opinion on direct appeal, the Georgia Supreme Court noted that one reason for concluding that the trial judge did not abuse his discretion in denying the motion for a change of venue was that the state presented overwhelming evidence of the petitioner's guilt. The court also suggested that any error that may have existed would have been harmless because "no other verdict could have reasonably been returned by a jury regardless of the locale of the trial." *Coleman v. State,* 237 Ga. 84, 226 S.E.2d 911, 918 (1976), *cert. denied,* 431 U.S. 909, 97 S.Ct. 1707, 52

facts proved at trial were such that death was the only appropriate sentence. We believe that there was, in fact, overwhelming evidence of the petitioner's guilt adduced at trial. Nonetheless, we conclude that that fact cannot be dispositive in assessing petitioner's change of venue claim. In *Rideau*, the evidence of guilt was also overwhelming; the Supreme Court nevertheless presumed prejudice. To hold otherwise would mean an obviously guilty defendant would have no right to a fair trial before an impartial jury, a holding which would be contrary to the well established and fundamental constitutional right of every defendant to a fair trial. In *Irvin v. Dowd*, the Supreme Court noted that a "fair trial in a fair tribunal is a basic requirement of due process" and stated that "[t]his is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." 366 U.S. at 722, 81 S.Ct. at 1642. Even if the Supreme Court precedent allowed us to consider harmless error as to guilt, the absolute discretion of a Georgia jury to grant mercy for any reason, *Zant v. Stephens*, 250 Ga. 97, 297 S.E.2d 1 (1982), would make it anomalous to apply the overwhelming evidence concept to the sentencing phase.

■ The state also argues that there was a substantial "cooling off" period between the commission of the crimes and petitioner Coleman's trial. Although there was some slackening of the publicity from July until November, several factors persuade us that there was not a sufficient change in the nature or amount of the publicity to conclude that "the feelings of revulsion that create prejudice have passed." *Patton v. Yount*, 467 U.S. 1025, ——, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847, 856 (1984). First, much of the procedural publicity during this time also reminded readers of the facts of the crimes, the suspects' escape from a Maryland prison, or the murder of Pennsylvania youth Richard Miller, and petitioner Coleman's confession to that murder. The first crime magazine, *Front Page Detective*, came out in August, during the supposedly cool period, and sold an unusually large number. Finally, there was intense publicity in the several weeks prior to petitioner Coleman's trial, recapitulating the details of the prejudicial publicity which had previously been reported, and adding the publicity of the recent trials and death sentences of Carl Isaacs and Dungee and the explicit details of Billy Isaacs' testimony.

■ The state argues that the voir dire record in this case rebuts any finding of presumed prejudice. Assuming that there can be such a rebuttal,[25] we conclude that the voir dire record in this case does not rebut the presumption of prejudice. We begin by detailing the manner in which voir dire examinations were conducted. The trial judge called prospective jurors

L.Ed.2d 394 (1977). However, the constitutional guarantee of a fair trial before an impartial jury is a fundamental constitutional right which cannot be the subject of harmless error analysis. *See Rideau, supra* (implicitly so holding, since there was overwhelming evidence of Rideau's guilt); *Irvin v. Dowd*, 366 U.S. at 722, 81 S.Ct. at 1642 (quoted in text *infra*). Moreover, as pointed out in the text, Georgia's sentencing scheme, which vests in the jury absolute discretion to grant mercy for any reason, renders it virtually impossible to apply the harmless error concept to the sentencing phase on the basis of overwhelming evidence.

**25.** We do not read *Rideau* to imply that the voir dire cannot rebut a presumption of prejudice. The Supreme Court held that due process required that the defendant be granted a change of venue "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury." 373 U.S. at 727, 83 S.Ct. at 1419. It might be argued that the threshold showing required to presume prejudice is so high that any rebuttal is inconceivable. However, without expressly deciding the issue, we decline to read *Rideau* in this fashion, *see Mayola v. Alabama*, 623 F.2d 992, 1000 (5th Cir.1980) (dicta) ("*Rideau* did not go so far as to indicate that voir dire had no role in the paradigm of presumptive prejudice"); *Pamplin v. Mason*, 364 F.2d 1, 6 n. 9 (5th Cir. 1966), and we assume that there can be such a rebuttal.

into the jury box in panels of twelve. The record indicates that all other members of the venire were in the courtroom while the panel of twelve was the subject of questioning. Questioning began with the prosecutor, who put a number of questions to the panel of twelve en bloc. Typically, special prosecutor Geer asked the prospective jurors if they had any prejudice or bias in their minds either for or against the defendant. Then the special prosecutor asked them if their minds were perfectly impartial between the state and the accused. After special prosecutor Geer finished with the en bloc questions, the trial court permitted the prosecutor and defense counsel to ask questions of the prospective jurors individually. The trial judge did not limit defense attorneys either in terms of the time to ask questions or in terms of the nature of the questions that they could ask. However, the voir dire is subject to question for several reasons. First, prospective jurors were examined in the presence of prospective jurors who had not yet been examined. In light of the significant possibility of prejudice, preferable voir dire procedures would have followed the ABA Guidelines:

> If there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to exposure shall take place outside the presence of other chosen and prospective jurors.

ABA Standard for Criminal Justice, § 8–3.-5(a) (2d ed. 1980) (quoted in C. Wright, 2 *Federal Practice & Procedure* § 381 at 337 n. 10 (2d ed. 1982)). In *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961), the trial court apparently used similar procedures in selecting jurors. In *Irvin*, the Supreme Court criticized the practice and stated:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father.

*Id.* In *Patton v. Yount*, 467 U.S 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the Supreme Court was faced with an actual prejudice claim similar to that presented in *Irvin*. In *Patton*, the Court specifically noted the "significant difference" in the voir dire procedures where veniremen were brought into the courtroom alone for questioning. Although not deemed controlling, that fact was nonetheless "not an insubstantial distinction." *Patton v. Yount*, 467 U.S. at —— n. 10, 104 S.Ct. at 2890 n. 10, 81 L.Ed.2d at 857 n. 10.

Another problem with the voir dire in petitioner Coleman's case is that the prospective jurors were not asked questions which were calculated to elicit the disclosure of the existence of actual prejudice, the degree to which the jurors had been exposed to prejudicial publicity, and how such exposure had affected the jurors' attitude towards the trial. *See Calley v. Callaway*, 519 F.2d 184, 208–09 (5th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976); *cf. Patton v. Yount*, 467 U.S. at —— n. 10, 104 S.Ct. at 2890 n. 10. Instead, leading questions and conclusory answers were typical of the manner in which Coleman's voir dire was conducted. For example, special prosecutor Geer began the individual questioning of prospective jurors and typically asked whether the juror understood "that this defendant, Wayne Carl Coleman, is presumed innocent until proven guilty to a moral certainty and beyond all reasonable doubt by the state of Georgia." Trial Record, Vol. 1 at 85. Geer also typically asked the juror whether he understood that the defendant "is innocent at this moment under the law." *Id.* Geer often asked, "Would the fact that you might have read something about this case from any source influence your mind one way or the other?" *Id.* Other typical questions included, "Would you go by the evidence in the case and the charge of court given you by the court?" Do you understand that the defendant doesn't have to prove anything?" and "The burden is on the state to prove him guilty beyond a reasonable doubt?" *Id.* at 86.

Similarly, although the questions posed by defense attorneys were somewhat more effective, they too tended to be conclusory. For example, the defense attorney would typically elicit the fact that the potential juror had read or heard about the crimes, i.e., some exposure. However, that would too often be followed up by a merely conclusory question: "Now, from having read about the homicides and also having read of the persons accused and having also seen this on television, is your mind now perfectly impartial between the state and the accused?"

Despite these problems with the voir dire in petitioner Coleman's case,[26] almost one-half of the jurors who were questioned as to whether they had formed an opinion, were stricken for cause for having a fixed opinion.

For the foregoing reasons, and in light of the overwhelming evidence that the community had prejudged both guilt and sentence, we are satisfied that the conclusory protestations of impartiality in the voir dire are not sufficient to rebut the presumption of prejudice. *Cf. Irvin v. Dowd,* 366 U.S. at 728, 81 S.Ct. at 1645 ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father").

## IV. CONCLUSION

We thus conclude that petitioner Coleman's evidentiary showing meets the extremely high standard necessary for a successful claim of presumed prejudice. We conclude that the district court's finding to the contrary is clearly erroneous, and that any decision to the contrary would be manifest error and would not be supported by the record. Accordingly, the decision of the district court is reversed and the case is remanded to the district court with instructions to issue the writ of habeas corpus conditioned on the state's right to retry the petitioner within a reasonable time.[27]

REVERSED and REMANDED.

---

**26.** An example illustrating the inadequacy of the voir dire occurred in the companion case involving Dungee. *See Isaacs v. Kemp,* 778 F.2d 1482 (11th Cir.1985), published simultaneously with this opinion. The voir dire of juror Harrington was conducted by the parties, including Dungee's counsel, in a conclusory manner, as in this case, not conducive to eliciting the existence of exposure to prejudicial publicity or the existence of actual prejudice. No evidence of actual prejudice was elicited, and Harrington sat as one of the twelve jurors in Dungee's case. However, in a later evidentiary hearing, it was disclosed that juror Harrington had actually sat through most of the trial of Carl Isaacs, which trial took place in the week preceding Dungee's. It was established that juror Harrington heard Billy Isaacs testify in the Carl Isaacs trial (which testimony also implicated Dungee) and thus had been exposed to the most damaging evidence against Dungee before Dungee's trial ever began.

**27.** No one familiar with the facts of this case and the overwhelming evidence of guilt could fail to have sympathy for the prolonged suffering of the families of these victims. The fatal error of trying this case in Seminole County was not their decision. Similarly, the unwarranted delay in the final disposition of this matter is not their fault.

However, under the law it is not relevant to the issues before us (and no one has suggested it is) how the responsibility for that delay is allocated or shared among the petitioner, the state (see note 14 *supra*) and the system itself. Moreover, it is of small consolation to them that more recently there are beginning to be some improvements in the system itself with respect to such delay. Also the law requires that even the obviously guilty are entitled to a fair trial. Minimal standards of due process require a fair trial "regardless of the heinousness of the crime .... [or] the apparent guilt of the offender." *Irvin v. Dowd,* 366 U.S. at 722, 81 S.Ct. at 1642.